**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
Ira M. Levee, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>Cloudeeva, Inc.,[1]<br><br>　　　　　　　Debtors. | Chapter 11<br><br>Case No.  14-24874 (KCF)<br><br>(Joint Administration Requested) |

**DECLARATION OF ADESH TYAGI IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Adesh Tyagi, pursuant to 28 U.S.C. § 1746, declare as follows:

1.　　I am the Chairman and Chief Executive Officer ("**CEO**") of Cloudeeva, Inc., a Delaware corporation ("**Cloudeeva Delaware**") and Cloudeeva, Inc., a Florida corporation ("**Cloudeeva Florida**") (jointly "**Cloudeeva**" or the "**Debtors**"), and certain of its affiliates (collectively the "**Company**").

2.　　I submit this declaration (the "**Declaration**") in accordance with the *Guidelines Governing First Day Matters*, set forth in Appendix A to rule 6003-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local Bankruptcy Rules**") in support of the Debtors' voluntary petitions for relief under chapter 11

---

[1]　　The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Cloudeeva, Inc., a Delaware Corporation (5326) and Cloudeeva, Inc., a Florida Corporation (2227). Cloudeeva, Inc., a Delaware Corporation's corporate headquarters are located at 104 Windsor Center Drive, Suite 300, East Windsor, New Jersey 08520.

(the "**Chapter 11 Cases**") of title 11 of the United States Code (the "**Bankruptcy Code**") filed as of the date hereof (the "**Petition Date**") and the motions and applications filed concurrently herewith (collectively, the "**First Day Pleadings**").

3.    I have reviewed the First Day Pleadings or have otherwise had their contents explained to me by the Company's legal advisors.  To the best of my knowledge, information, and belief formed after reasonable inquiry, I believe that approval of the relief requested in the First Day Pleadings is necessary to minimize disruption to the Debtors' business operations, permit a smooth and effective transition into chapter 11, and preserve and maximize the value of the Debtors' estates.  I also believe that absent immediate access to financing and authority to make certain essential payments and otherwise continue conducting ordinary course business operations, as described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of their estates, creditors, and other stakeholders.

4.    Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' business operations, my review of relevant documents, information provided to me or verified by other managers, employees or the Debtors' legal advisor including Lowenstein Sandler LLP ("**Lowenstein Sandler**") and/or my opinion based upon my experience, and/or my personal knowledge of the Debtors' financial records.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

5.    I am authorized to submit this Declaration on behalf of the Debtors and, if called upon, I could and would testify competently to the facts set forth herein.

## PART I
## BACKGROUND

### A.    Company History, Organization, and Structure

6.    Cloudeeva Florida is a public company previously known as Systems America, Inc., a Florida corporation ("**SA Florida**").  Cloudeeva Florida is a holding company which owns 100% of the equity of Cloudeeva Delaware.

7.    Cloudeeva Delaware is a wholly owned subsidiary of Cloudeeva Florida. Cloudeeva Delaware was originally known as Systems America, Inc., a Delaware corporation ("**SA Delaware**"), incorporated in 1994.  Cloudeeva Delaware is the surviving entity of a merger between Bartronics America, Inc., a Delaware corporation ("**BAI**"), and SA Delaware in 2012.

8.    On December 7, 2012, SA Florida entered into a Stock Exchange Agreement ("**SEA**") with Bartronics Asia Pte Ltd, a Singapore corporation ("**BAPL**").  Under the SEA, SA Florida transferred 62% of its stock to BAPL and, in exchange, BAPL transferred 100% of the stock in BAI to SA Florida.

9.    As part of the SEA transaction, on December 31, 2012, BAI merged into SA Delaware.  In early 2013, SA Delaware changed its name to Cloudeeva, Inc., a Delaware corporation, and SA Florida changed its name to Cloudeeva, Inc., a Florida corporation. Following the SEA transaction, the former employees and executive management of BAI became employees and managers of Cloudeeva Delaware.

10.    Adesh Tyagi is the Chairman and CEO of Cloudeeva, as well as the sole member of the Board of Directors of each company.  Cloudeeva's executive management team includes several senior vice presidents, including a Chief Financial Officer and in-house General Counsel.

### B.    Current Business and Operations

11.    Today, the Company is a global cloud services and technology solutions company specializing in Cloud, Big Data and Mobility solutions and services.  The Company

provides information technology staffing services to major clients and third party vendors in United States and India.

12.    Cloudeeva Delaware is headquartered in East Windsor, New Jersey, with regional offices in San Ramon, California (executive office) and Rolling Meadows, Illinois, and international offices in New Delhi, Hyderabad, Bangalore and Kolkata, India. The Company is a premier provider of diversified cloud computing and information technology solutions to commercial and government clients worldwide. The Company has helped companies streamline their organization with end-to-end visibility and control of business analytics by optimizing forecasting, planning, scheduling, mobility and real-time management of resources.

13.    The Company employs 318 W-2 employees and 27 independent contractors in the United States.   In 2013, the Company generated revenues of over $34.448 million, and in the first half of 2014 generated revenues of $15.72 million.  Provided the Company does not lose any customers, employees or vendors, the Company anticipates generating revenues of $31.0 million for the financial year from January to December 2014.

C.    **The Debtors' Prepetition Debt Structure**

(i)    **Prepetition Credit Agreement**

14.    The Company is a party to that certain credit agreement (the "**Pre-Petition Credit Agreement**") dated as of March 10, 2014 with Prestige Capital Corporation based in New Jersey ("**Prestige**" or the "**Pre-Petition Agent**").  As of the Petition Date, the Debtors were indebted to Prestige in the sum of approximately $209,000.

(ii)    **Trade Debt**

15.    As of the Petition Date, the Debtors have aggregate unsecured debts totaling approximately $6.137 million, which include amounts due and owing for independent contractors, vendors, merchandise, utilities, rent, professional fees, and employee-related expenses.  Of that amount, approximately $5.219 million constitutes trade vendor payables.

## PART II
## EVENTS LEADING TO THE DEBTORS' CHAPTER 11 CASES

16.    Following the consummation of the SEA transaction, Cloudeeva discovered, through forensic accounting experts, that the prior management team of BAI that had stayed on to manage and operate Cloudeeva Delaware, was engaged in a massive accounting fraud and financial mismanagement of the company.    Cloudeeva's forensic investigation revealed that more than $1.3 million had been improperly withdrawn and transferred from Cloudeeva Delaware's bank accounts by the company's executives (former executives of BAI and BAPL), that the financial records of the company contained false entries and were not kept according to sound accounting principles and standards, and that substantial improper payments were being made to BAPL, BAPL's affiliated companies, BAI's affiliated companies, and companies affiliated with certain BAI/Cloudeeva Delaware and BAPL executives. All of these improper payments, withdrawals and transfers of cash assets of Cloudeeva Delaware were done without the knowledge, authority or consent of Adesh Tyagi, Chairman and CEO of Cloudeeva Delaware and Cloudeeva Florida.

17.    In order to hide the accounting fraud and financial mismanagement of the company by the former BAI executives, in August 2013, BAPL (former parent company of BAI and party to the SEA with SA Florida) filed a lawsuit against Adesh Tyagi in the New Jersey Superior Court, seeking injunctive relief to prevent Adesh Tyagi, Chairman and CEO of Cloudeeva Delaware, from gaining access to the financial records and bank accounts of Cloudeeva Delaware.    The court soundly rejected BAPL's request for injunctive relief and the case was promptly dismissed.    However, the court ordered that Adesh Tyagi was the lawful CEO of Cloudeeva Delaware, and that he was entitled to full access to the company's books and records.

18.    Following the New Jersey court's rejection of BAPL's complaint for injunctive relief, and dismissal of that action, BAPL promptly re-filed its case in September 2013 in state court in California, seeking the same type of relief that had been denied by the New

Jersey court, including rescission of the SEA transaction. This time, BAPL was able to convince the California court to issue a preliminary injunction against Cloudeeva in order to maintain the status quo between the parties pending a final resolution of BAPL's claims. The preliminary injunction, and orders issued by the California court subsequent to and modifying the injunction, prohibited Cloudeeva from taking certain actions on behalf of the Company, including any mergers and acquisitions, transactions outside the ordinary course of business or granting liens on any of the company's assets. Cloudeeva filed a cross-complaint against BAPL and multiple other parties in the California action, asserting claims for fraud in the inducement of the SEA, breach of the SEA, conversion of corporate assets, unfair business practices and similar types of claims. In its cross-complaint, Cloudeeva seeks monetary damages against BAPL in excess of $30.0 million. in addition to punitive damages. Cloudeeva's damage claims against BAPL include a claim for $14.9 million that BAPL represented in the SEA was a valid and collectible debt owed by Veneta Holdings Limited, a wholly owned subsidiary of BAPL (a note given as payment for certain patents), and a claim for $11.75 million that BAPL represented in the SEA was money owed by Exxova Worldwide Corporation, a BAPL and BAI affiliated company. These two debts owed to Cloudeeva as partial consideration for the SEA (in excess of $26.0 million) were carried as assets on BAI's balance sheets and financial statements provided to SA Florida as an inducement to enter into the SEA. The claims of BAPL and the cross-claims of Cloudeeva are now the subject of a pending arbitration (ordered by the California court) before Judicial Arbitration and Mediation Services ("JAMS") in California.

19.    The litigation initiated by BAPL in California has been an enormous drain on Cloudeeva's financial resources. Cloudeeva has incurred outside legal fees in excess of $1.2 million litigating the case, as well as arbitration and expert witness fees in excess of $200,000. Moreover, the preliminary injunction issued by the California court (which is still in effect) has caused extreme financial hardship to Cloudeeva. For example, prior to BAPL's filing of its lawsuit in September of 2013, SA Florida was actively seeking to acquire an information technology services company, S&T AG, based in Austria ("**S&T**") in a $170 million transaction.

SA Florida had entered into a letter of intent with S&T and incurred due diligence fees in excess of $400,000 pursuing the acquisition. The preliminary injunction stopped Cloudeeva from pursuing the S&T transaction and, as a result of the preliminary injunction and the pending California lawsuit, S&T has demanded that Cloudeeva pay a break-up termination fee of $1.6 million under the terms of the letter of intent.

20.    Cloudeeva's financial condition over the past year has also been adversely affected by the massive amounts of funds withdrawn from Cloudeeva's bank accounts by BAPL and BAI's former executives, and the enormous costs incurred by Cloudeeva in litigating the meritless California case brought by BAPL.    To minimize the impact of these events, and to ensure the continued viability of the company, Cloudeeva sought permission from the California court to allow it to factor its receivables.    The court initially allowed Cloudeeva to do some limited factoring over a three-month period (March, April and May), but refused to allow the company to continue factoring its receivables.    In the absence of factoring, Cloudeeva has undertaken extensive cost-cutting measures to improve its financial condition, including termination of its outside counsel and hiring in-house counsel to represent the Company in litigation matters, reducing administrative personnel, and eliminating certain executive positions.

21.    As an IT consulting and staffing business, Cloudeeva must pay its employees and consultants before it receives payment for the services the employees render to vendors and customers.    Cloudeeva must either build a significant cash reserve in order to meet payroll, including payroll insurance, workers' compensation and payroll taxes to local, state and federal governmental agencies, or Cloudeeva must borrow against its receivables.    As a result of the California lawsuit, the huge financial drain the litigation is having on Cloudeeva's financial resources, and the California court's restrictions on Cloudeeva's ability to borrow (including restrictions on borrowing against its receivable in the form of factoring), Cloudeeva is now struggling to meet its ongoing payroll obligations.

22.    In response to the foregoing circumstances, the Debtors took the necessary step of commencing these Chapter 11 Cases to preserve the value of their assets for the benefit of the Debtors' estates, their creditors, and their other stakeholders.

## PART III
## FIRST DAY PLEADINGS

23.    It is critically important for the Debtors to maintain the loyalty and goodwill of, among other constituencies, their vendors, employees, and customers.  Achieving this goal is likely to be particularly challenging while proceeding through the Chapter 11 process.  To that end, the Debtors filed the First Day Pleadings seeking relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.  Unless this "first day" relief is granted, I believe the Debtors' business operations will suffer significant adverse, immediate, and irreparable consequences.

24.    Several of the First Day Pleadings request authority to pay certain pre-petition claims.  I am told by my advisors that Rule 6003 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**") provides, in relevant part, that the Court shall not consider motions to pay pre-petition claims during the first 21 days following the filing of a chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, and as set forth below, the Debtors have narrowly tailored their requests for immediate authority to pay certain pre-petition claims to only those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Accordingly, certain requests for relief will be deferred for consideration at a later hearing.

25.    I have reviewed each of the First Day Pleadings or had their contents explained to me.  The facts stated therein and described below are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their

business operations, and constitutes a critical element in successfully restructuring the Debtors' business. A brief summary of the relief sought in each of the First Day Pleadings is as follows:[2]

A. **Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")**

26.     The Debtors request entry of an order pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1015(b) directing joint administration of the Chapter 11 Cases for procedural purposes only. Specifically, the Debtors request that this Court maintain one file and one docket for each of the Chapter 11 Cases under the lead case of Cloudeeva Delaware. Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 Cases to indicate the joint administration of the Chapter 11 Cases.

27.     The Debtors also seek authority to file the monthly operating reports required by the U.S. Trustee's Operating Guidelines on a consolidated basis, but intend to track and break out disbursements on a Debtor-by-Debtor basis.

28.     Given the integrated nature of the Debtors' businesses, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest. Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases will almost certainly affect each of the Debtors. The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.

29.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

---

[2]     This section is intended only as a summary of the key provisions of the First Day Pleadings and the relief sought therein. To the extent that this Declaration is inconsistent with any provisions of any of the First Day Pleadings, the terms of the First Day Pleadings shall control. The Court is respectfully referred to the First Day Pleadings for the full details thereof.

Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

    **B.**    **Debtors' Application Authorizing the Retention of Kurtzman Carson Consultants LLC as Claims and Noticing Agent to the Debtors Effective as of the Petition Date (the "<u>Claims Agent Retention Application</u>")**

    30.    By the Claims Agent Retention Application, the Debtors seek to retain Kurtzman Carson Consultants LLC ("<u>KCC</u>") as notice and claims agent in connection with these Chapter 11 Cases to assist the Debtors in preparing, among other things, creditor lists and mailing initial notices. Because KCC, if approved by this Bankruptcy Court, will serve all required notices, filing a list of creditors with the Court serves no independent purpose and should be waived in these Chapter 11 Cases. In addition, KCC will assist with compiling a creditor database from the Debtors' records and will complete the mailing of relevant notices as set forth above. The Debtors believe that providing KCC with a list of creditors in the electronic format used in the Debtors' ordinary course of business will be sufficient to allow timely notice to all creditors. The Debtors do not believe that they could efficiently and accurately convert their own records into matrix format more quickly than a consolidated list could be completed by KCC. The Debtors believe they would incur unnecessary expense were they to try to make such a conversion. I believe that, allowing the Debtors to maintain a creditor list in electronic form would be in the best interests of all parties.

    31.    In addition, the proposed Notice Procedures are fair, reasonable, sufficient, and proper in these Chapter 11 Cases. The Notice Procedures will provide any party in interest that may be affected by the relief sought by a particular filing or pleading with notice thereof.  Interested parties who have expressed an interest in receiving notice will also be provided for under the Notice Procedures. The Notice Procedures will not adversely affect the relevant parties in interest. Further, the Notice Procedures will preserve the assets of the Debtors' estates that would otherwise be consumed by unnecessary expenses in providing notice to all parties-in-interest.

**C.**     **Debtors' Motion for an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "Schedules and Statements Motion")**

32.     The Debtors request entry of an order granting a 30-day extension of the time to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules and Statements**") for a total of 44 days after the Petition Date. The Debtors have hundreds of potential creditors, and the breadth of the Debtors' business operations require the Debtors to maintain voluminous books and records, and complex accounting systems.  Given the size, complexity, and geographic scope of the Debtors' operations, as well as the number of creditors, I submit that the large amount of information that must be assembled to prepare the Schedules and Statements, and the hundreds of employee and advisor hours required to complete them, would be unnecessarily burdensome to the Debtors during the first 14 days following the Petition Date.  The Debtors are sensitive to the need to complete the Schedules and Statements as soon as possible, and they intend to complete the Schedules and Statements before the proposed 44-day deadline, if possible.

33.     I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and Statements Motion should be granted.

**D.**     **Debtors' Motion for Entry of an Order (I) Granting the Debtors an Extension of Time to File Their List of Creditors and (II) Authorizing the Debtors and/or Their Agent to (A) Prepare Consolidated Lists of Creditors and Interest Holders in Lieu of a Mailing Matrix and (B) Mail Initial Notices (the "Creditor Matrix Motion")**

34.     Pursuant to the Creditor Matrix Motion, the Debtors request entry of an order granting them an extension of time to file their list of creditors for 30 days after the Petition Date.  The Debtors also propose to prepare a consolidated list of creditors and interest holders available to all parties-in-interest in lieu of submitting a mailing matrix.  Finally, the Debtors

request that KCC, their proposed notice and claims agent, undertake all mailings directed by this Court, the U.S. Trustee, or as required by the Bankruptcy Code, including the notice of commencement of the Chapter 11 Cases.

35.    As previously stated, the Debtors have hundreds of potential creditors, and the breadth of the Debtors' business operations require the Debtors to maintain voluminous books and records, and complex accounting systems.  Given the size and scope of the Debtors' operations and the number of creditors, I submit that the large amount of information that must be assembled to prepare the list of creditors, and the hundreds of employee and advisor hours required to complete it, would be unnecessarily burdensome to the Debtors at the beginning of the Chapter 11 Cases, which is a critical time for the Debtors.  The Debtors are sensitive to the need to complete the list of creditors as soon as possible, and they intend to complete the list of creditors before the proposed 30-day deadline, if possible.

36.    I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be granted.

**E.    Debtors' Motion for an Order (I) Authorizing the Debtors to Continue to Maintain their Existing Cash Management System, Bank Accounts and Business Forms, (II) Modifying the Investment Guidelines, (III) Providing the United States Trustee With a 60-Day Objection Period and (IV) Granting Related Relief (the "Cash Management Motion")**

37.    The Debtors request entry of an order (i) authorizing the Debtors to maintain their existing bank accounts and cash management system and continue to use existing business forms and records, (ii) modifying the investment guidelines set forth in section 345 of the Bankruptcy Code, (iii) providing the United States Trustee with sixty days to object to the relief requested in the Cash Management Motion, and (iv) granting related relief.  In connection with this relief, the Debtors request a waiver of certain of the operating guidelines established by the United States Trustee for the District of New Jersey (the "U.S. Trustee") that require the

Debtors to close all of their pre-petition bank accounts, open new accounts designated as debtor-in-possession accounts and obtain new business forms and statements.

38.    In the ordinary course of their operations, the Debtors maintain a cash management system to receive and disburse funds. The Debtors' customers pay accounts receivable directly into the account of Prestige Capital Corporation at Santander Bank. Any accounts receivable received directly by the Debtors are held in the depository accounts of each Debtor and are transferred on a weekly basis to the account of Prestige Capital Corporation at Santander Bank. After deducting its fees and advances for factored receivables, the funds are transferred by Prestige Capital Corporation to the Debtors' depository accounts (the "**Depository Accounts**"). New advances under the factoring agreement, if any, are transferred into the Debtors' depository accounts at Wells Fargo Bank. Funds from the Debtors' Depository Accounts are swept daily directly into the Debtors' main control concentration account maintained at Wells Fargo Bank (the "**Control Concentration Account**"). Funds are then transferred from the Control Concentration Account as needed to each of the Debtor's disbursement accounts to fund payments for operations, and, in certain instances, to fund certain expenses of the Debtors' foreign subsidiaries and vendors

39.    If the Debtors are required to open separate accounts as debtors-in-possession and modify the Cash Management System in accordance with the U.S. Trustee Guidelines, such process would necessitate opening new accounts for collections, cash concentration, and disbursements. In fact, the Debtors would need to open dozens of new bank accounts. Thus, the Debtors' treasury, accounting, and bookkeeping employees would be forced to focus exclusively on immediately opening new bank accounts, instead of on their daily responsibilities during this critical juncture of the Chapter 11 Cases. The opening of new bank accounts would certainly increase operating costs, thereby negatively impacting the Debtors' cash flow. Most importantly, delays that would result from opening new accounts, revising cash management procedures, instructing customers to redirect payments, and implementing new information technology protocols would negatively impact the Debtors' ability to operate their

businesses while pursuing these arrangements. Additionally, the Debtors would be subject to significant administrative burdens and expenses because they would need to execute new signatory cards and depository agreements, and create an entirely new manual system for issuing checks and paying post-petition obligations.

40.    I believe the Debtors' continued use of the Cash Management System will greatly facilitate their transition into the Chapter 11 Cases by, among other things, avoiding administrative inefficiencies and expenses, minimizing delays in payment of post-petition debts, and providing important internal controls. I believe that parties-in-interest will not be harmed by the Debtors' maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date. Specifically, the Debtors and their advisors have implemented internal protocols that prohibit payments on account of pre-petition debts without the prior approval of appropriate managers. In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

41.    Given the substantial economic scale and geographic reach of the Debtors' business operations, I believe that any disruption to the Cash Management System could impede a successful restructuring of the Debtors' businesses. Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and will enable the Debtors to operate their businesses in chapter 11 without disruption. Therefore, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

F.    **Debtors' Motion For Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Discontinuing, Altering or Refusing Service on Account of Pre-Petition Invoices, (II) Approving the Debtors' Proposed Form of Adequate Assurance of Future Payment and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance (the "Utilities Motion")**

42.    By the Utilities Motion, the Debtors seek entry of interim and final orders: (i) prohibiting the Utility Companies (defined below) from discontinuing, altering or refusing

service to the Debtors on account of pre-petition invoices, (ii) approving the Debtors' proposed form of adequate assurance of post-petition payment within the meaning of section 366 of the Bankruptcy Code and determining that the Utility Companies have been provided with adequate assurance and (iii) establishing procedures for resolving requests for additional or different adequate assurance of payment. The Debtors further request that the Court schedule a final hearing to consider entry of a final order granting the relief requested in the Utilities Motion (the "**Final Hearing**").

43.    In connection with the operation of their facilities, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, electricity, gas, internet, telephone and similar utility products and services (collectively, the "**Utility Services**") from various utility companies (the "**Utility Companies**").

44.    For the prior twelve (12) months ended April 30, 2014, the Debtors spent approximately $53,598 for various Utility Services, with an average monthly cost of approximately $4,466.

45.    Given the nature of the Debtors' business, uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' Chapter 11 efforts. Indeed, any disruption to the Debtors' service locations by virtue of the cessation of utility services by the Utility Companies could bring the Debtors' operations to a grinding halt. Should one or more of the Utility Companies refuse or discontinue service even for a brief period, the Debtors' operations would be severely disrupted. Such an interruption would severely damage customer relationships, revenues and profits, and would adversely affect the Debtors' Chapter 11 efforts, to the detriment of their estates, creditors, and employees. It is therefore critical that the Utility Services provided to the Debtors continue uninterrupted.

46.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

G.    **Debtors' Factoring Motion for Approval of Proposed Factoring Agreement
and Order Authorizing Immediate Borrowing (the "Factoring Motion")**

47.    By the Factoring Motion, Debtors seek interim and final approval of a
factoring agreement with Prestige Capital Corporation.

48.    Historically, the Debtors did not have any secured debt. Rather, Debtors
used cash on hand and cash flow from operations to fund working capital, merchandise
purchases, service provider fees and expenses, capital expenditures, and other general corporate
expenses

49.    In order to protect the value of the Debtors pending the outcome of
litigation with Bartronics Asia, the California Superior Court entered an order on October 15,
2013, a copy of which is annexed as Exhibit B to the Factoring Motion, granting a preliminary
injunction prohibiting the Debtors from "encumbering any assets of Cloudeeva, Inc., a Delaware
corporation or using any assets of Cloudeeva, a Delaware corporation, as collateral for any loan"
(*sic*) pending the outcome of that litigation. As a result of costs incurred in connection with the
litigation with Bartronics Asia and interruptions in the Debtors' business caused by Bartronics
Asia, Debtors suffered a severe cash flow crisis in early 2014. In order to meet operating
expenses, Debtors sought authority from the California Superior Court to enter into a factoring
agreement. By order entered on March 10, 2014, a copy of which is annexed as Exhibit C to the
Factoring Motion, the California Superior Court modified the preliminary injunction to allow the
Debtors to factor their receivables on a limited basis.

50.    The Debtors thereafter entered into a factoring agreement with Prestige
Capital (the "**Factoring Agreement**"). Pursuant to the terms of the Factoring Agreement,
Prestige would pay Debtors eighty percent of the face value of accounts sold under the Factoring
Agreement up to a maximum amount of $2,000,000. Prestige would then hold in reserve the
difference between the purchase price for the receivables purchased and the 80% down payment.
Provided that there were no outstanding chargebacks or disputes, Prestige would pay the reserve,
less any sums due Prestige within five business days of the date on which the accounts were

collected.  Per the Factoring Agreement, Prestige would earn a fee on each account purchased based on a sliding scale depending on when the account was collected.  For example, Prestige would earn a fee of 2.15% if the account were paid within 30 days and a fee of 2.87% if the account was paid within 40 days.  Prestige's fee continued to increase as the time of collection increased.  The obligations due to Prestige are also secured by a lien on the Debtors accounts, inventory, machinery and equipment, instruments, documents, chattel paper and general intangibles, and the proceeds thereof.  The obligations are further secured by the personal guarantee of the Debtors' Chairman and CEO, Adesh Tyagi.  Prestige's willingness to enter into the factoring Agreement was further conditioned on Mr. Tyagi remaining in control of the Debtors.

51.    Because the Debtors' liquidity crisis turned out to be more severe than originally anticipated, the Debtors sought further modification of the preliminary injunction to approve overages in the amount of accounts factored to meet operating expenses and to expand the authority to factor additional receivables going forward.  The California Superior Court denied this request in an Order entered on June 9, 2014, a copy of which is annexed as Exhibit F for the Factoring Motion, ruling:

> Given the apparent difficulty defendant has had in estimating the duration of the need for and the actual costs of factoring and in complying with the court's conditions placed on obtaining factoring, this court is unwilling to further extend the exception to allow the company to increase its operating costs and/or to incur debtor while this action is pending. . .  Defendant must explore other ways in which to meet its payroll obligations on (sic) the short term.

52.    Debtors are proposing to enter into a post-petition factoring agreement ("**Post-Petition Factoring Agreement**") on substantially the same terms as the Factoring Agreement.  Debtors have sought alternate financing with which to finance their operations, but have been unable to obtain financing on any other terms due to concerns about the continued

viability of the Debtors given the rescission claims asserted by Bartronics Asia in the California litigation. Without authority to obtain financing through the factoring of receivables during the Chapter 11 Cases, the Debtors' will be unable to meet payroll due on August 15 or to meet other necessary operating expenses. Debtors also require approval of the Post-Petition Factoring Agreement to, among other things, continue operating their businesses in an orderly manner, maintain business relationships with vendors, service providers, suppliers, and customers, pay employees, and satisfy other working capital and operational needs – all of which are necessary to preserve and maintain the value of the Debtors' assets for the ultimate benefit of the Debtors' estates and their creditors. As set forth in more detail in the Financing Motion, access to the factoring provided by the Post-Petition Factoring Agreement is critical to the Debtors' ability to continue to operate and to permit the Debtors' to maximize the value of their assets for the benefit of the Debtors' stakeholders.

53.    As set forth in the Financing Motion, the Debtors' execution of the Post-Petition Factoring Agreement is an exercise of their sound business judgment that warrants approval by the Court. The Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity are vital to preserve and maintain the value of the Debtors' assets for the benefit of their estates and creditors.

54.    For the foregoing reasons, I believe that the terms and conditions of the Post-Petition Factoring Agreement are fair, reasonable, and negotiated in good faith and at arms'-length after extensive efforts to obtain the most advantageous post-petition financing. The Debtors have determined, in their reasonable business judgment, that the Post-Petition Factoring Agreement is the best financing option available under the present circumstances. I further believe that the relief requested in the Financing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to operate their business in chapter 11 without disruption. On behalf of the Debtors, I respectfully request that the Court, (a) approve the Post-Petition Factoring Agreement on an interim basis pursuant to

the Interim DIP Order, and (b) enter the Final DIP Order at the Final Hearing (as those terms are defined in the Financing Motion).

**H.    Debtors' Motion for Entry of an Order Authorizing But Not Directing Debtors to Pay Foreign Vendor Claims (the "Foreign Vendor Motion")**

55.    By this Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to the pay pre-petition claims of the Foreign Vendors (the "**Foreign Vendor Claims**") in their discretion, and in the ordinary course of business, up to $145,000.00.

56.    In the ordinary course of business, the Debtors purchase goods or services from foreign vendors (collectively, the "**Foreign Vendors**") that are not subject to the jurisdiction of the United States.  These Foreign Vendors include service providers that provide back office, resourcing, business development, marketing, information technology, computer software development and computer software maintenance services that are vital to the Debtors' business operations and, concomitantly, to the value of the Debtors' assets.  As of the Petition Date, the amounts owed to the Foreign Vendors totals approximately $145,000.00.

57.    The Foreign Vendors may sue the Debtors in a foreign court to recover any pre-petition amounts owed to them. If they are successful in obtaining a judgment against the Debtors, the Foreign Vendors may seek to exercise post-judgment remedies including seeking to attach the Debtors' foreign assets or withhold vital products, supplies and services from the Debtors.  Since the Debtors would have limited, if any, effective and timely recourse and no practical ability to remedy this situation (absent payment of amounts sought), their businesses could be irreparably harmed by any such action to the detriment of their estate and their creditors.

58.    Payment of the Foreign Vendor Claims will allow the Debtors to continue to receive the products and services of, as well as eliminate the risk of the potential collection attempts by, the Foreign Vendors. I therefore believe that, given the circumstances and practical realities, it is in the best interests of the Debtors' estates and creditors to have the authority to satisfy the Foreign Vendor Claims.  Accordingly, I hereby request the Court's authority to pay

the Foreign Vendor Claims because payment of such claims is necessary to preserve the value of the Debtors' assets.

**I.     Debtors' Motion for Entry of Interim and Final Orders Authorizing But Not Directing the Debtors to Pay Certain an Order Authorizing But Not Directing Debtors to Pay Certain Critical Vendor Claims ("Critical Vendor Motion")**

59.     By this Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay pre-petition claims of certain vendors that are critical to the Debtors' operations, as more fully described herein (the "**Critical Vendor Claims**"), up to $1,226,054 on an interim basis, and up to $1,451,256 on a final basis.

60.     The Debtors have determined that approximately 62 of their vendors, who are collectively owed $1,451,256 as of the Petition Date, are Critical Vendors.  Fifty-one of the Critical Vendors, who are owed $904,876 as of the Petition Date, are consulting companies that provide or previously provided consultants to the Debtors for placement on-site with the Debtors' customers.

61.     In the ordinary course of business, the Debtors contract with third party consulting companies to provide the Debtors with consultants with special skills required by Debtors' customers that are not otherwise available to the Debtors.  These consultants often work side-by-side at the premises of the Debtors' customers along with the Debtors' employee consultants and other consultants under contract to the Debtors.  Debtors' customers often pre-pay the fees for services to be provided by the independent consultants retained by the Debtors.  The Debtors failure to pay the counter-parties to the consulting contracts could result in the consultant's not being paid by their employers, the consultants being withdrawn from providing services to the Debtors' customers or in the counter-party the contracts placing the consultants with the Debtors customers for their own account.  In addition, customer dissatisfaction with disruption created by the failure to pay these consultants could result in the Debtors ultimately losing customers altogether.

62. Debtors also purchase goods and services from other Critical Vendors that, as an actual or practical matter, may be the only resources available to the Debtors. Certain of the Critical Vendors are sole-source providers. Other Critical Vendors are impossible to replace given the nature of goods and services provided.

63. Having to replace Critical Vendors who are holding products/resources or who are in the process of fulfilling the Debtors' contracts would be tremendously detrimental to the Debtors' business. These Critical Vendors have been working with the Debtors' customers for a long time and any delay in delivery of services or resources or variance in quality may cause the Debtors' customers to cancel their contracts, delay payment, and/or seek alternate suppliers. As such, the goods or services provided by Critical Vendors are essential to maintaining the Debtors' customer base and to preserving the going concern value of their business.

64. I submit that authority to pay the Critical Vendor Claims on the terms set forth herein and in the Critical Vendor Motion is in the best interests of the Debtors, their estates, customers and creditors, and therefore should be granted.

### J. Debtors' Motion for Entry of Order Authorizing But Not Directing the Debtors to Pay Pre-Petition Wages, Salaries and Related Obligations (the "Wage Motion")

65. By this Motion, the Debtors request entry of an order (i) authorizing, but not directing, the Debtors to pay certain wages, salaries, benefits, taxes, and other expenses related to the workforce employed in the Debtors' business, and (ii) directing all banks to honor and pay (to the extent that sufficient funds are available in the Debtors' accounts) all checks and transfers for payment of pre-petition employee obligations.

66. In the ordinary course of their business operations, the Debtors employ approximately 318 individuals (collectively, the "**Employees**") in their business divisions and corporate headquarters, all of whom are full-time employees. Approximately 50 of these employees are executive and administrative personnel that work at Debtors' offices. The remainder are consultants that work on site at Debtors' customers. Executive and administrative

employees are paid bi-weekly in in arrears. Consultants are paid monthly on the 15th day of the month following the number which services are rendered (for example, consultants will be paid on August 15th for services rendered in July). The wages and salaries owed to the Employees as of the Petition Date total approximately $1,357,041.

67.     The continued, uninterrupted service of the Employees is essential to the Debtors' efforts to maximize the value of their estates. Any delay in paying outstanding wages, salaries, and other compensation due to the Employees as of the Petition Date or the failure by the Debtors to continue their pre-petition practices, programs, and policies with respect to Employee benefits could severely disrupt the Debtors' relationship with their Employees, impair morale at this critical juncture, and disrupt the Debtors' business operations, all of which would irreparably harm the value of the Debtors' estates.

68.     Accordingly, by this Motion, the Debtors seek an order authorizing, but not directing, the Debtors to (i) pay all pre-petition Employee claims for wages, salaries, commissions, sick pay, personal day pay, vacation pay, holiday pay, and other accrued compensation; (ii) make all payments for which Employee payroll deductions were withheld pre-petition; (iii) reimburse all pre-petition Employee business and other expenses; (iv) make pre-petition contributions and pay benefits under certain Employee benefit plans; (v) honor workers' compensation programs; (vi) pay other miscellaneous Employee-related costs including but not limited to processing costs and fees; (vii) continue Employee programs with respect to vacation, sick, personal, and holiday leave; and (viii) continue certain health, welfare, savings, and other benefit programs (collectively, the "**Employee Obligations**"), as described more fully in the Wage Motion. I respectfully submit that for the reasons stated in the Wage Motion that the relief requested in the Wage Motion is in the best interests of the Debtors' estates.

## **CONCLUSION**

69.     The relief sought in each of the First Day Pleadings will minimize the adverse effects of the Chapter 11 Cases on the Debtors and result in maximum creditor recoveries.  I believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate effectively as debtors-in-possession.

70.     Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as this Court deems just and proper.

Executed: July 21, 2014

CLOUDEEVA, INC.

By:   Adesh Tyagi
      Chairman and Chief Executive Officer