**FOX ROTHSCHILD LLP**

75 Eisenhower Parkway, Suite 200
Roseland, New Jersey 07068
Telephone: 973-994-7515
Richard M. Meth, Esq. (RM7791)
rmeth@foxrothschild.com

     -and-

**BROWN RUDNICK LLP**

Daniel J. Saval (*pro hac vice* to be filed)
Mason C. Simpson (*pro hac vice* to be filed)
Shoshana B. Kaiser (*pro hac vice* to be filed)
7 Times Square
New York, New York 10036
Telephone: 212-209-4800
Facsimile: 212-209-4801

*Counsel for Bartronics Asia Pte Ltd.*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
-------------------------------------------------------------X
                                :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CLOUDEEVA, INC., | : | Case No. 14-24874 (KCF) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |

-------------------------------------------------------------X

**BRIEF IN SUPPORT OF MOTION OF
BARTRONICS ASIA PTE LTD. FOR ENTRY OF AN ORDER
(I) DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE OR,
(II) IN THE ALTERNATIVE, DISMISSING THE CHAPTER 11 CASES**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

JURISDICTION AND VENUE................................................................................. 4

STATEMENT OF FACTS......................................................................................... 4

   A.  Tyagi Fraudulently Induces the Stock Exchange Agreement. ............................. 4

   B.  Tyagi Unlawfully Takes Control of the Debtors.................................................. 6

   C.  BAPL Commences Litigation Against Tyagi. ...................................................... 8

   D.  The California Court Grants a Preliminary Injunction in Favor of BAPL......................... 10

   E.  Tyagi Repeatedly Violates Orders of the California Court
      And Otherwise Mismanages the Debtors' Business. ....................................... 11

   F.  Tyagi Wastes Company Funds on Frivolous Litigation.................................... 13

   G.  Cloudeeva Delaware's Declining Performance Under Tyagi's Control. .......................... 16

   H.  Upon the Invitation of the California Court, BAPL Moves to Appoint a Receiver. .......... 18

ARGUMENT ........................................................................................................... 20

   I.  A Chapter 11 Trustee Should be Appointed to Protect the Debtors' Estates..................... 20

      A.  There is Ample "Cause" to Support the
         Mandatory Appointment of a Trustee Under 11 U.S.C. § 1104(a)(1). ......................... 21

         i.  A Trustee is Necessary Because Tyagi is a Convicted Felon With a History of
            Fraudulent and Dishonest Business Dealings. ......................................... 22

         ii.  A Trustee is Necessary Because Tyagi is Engaged in Self-Dealing...................... 23

         iii.  A Trustee is Necessary Because Tyagi Has Grossly Mismanaged the Debtors'
            Business................................................................................. 25

         iv.  A Trustee is Necessary Because Tyagi Routinely Defies Court Orders................. 26

      B.  Alternatively, This Court Should Appoint a Trustee In The
         Interests of the Estates and All Other Parties Under 11 U.S.C. § 1104(a)(2)............... 28

   II.  In The Alternative to Appointing a Trustee,
      The Chapter 11 Cases Should be Dismissed. ................................................... 32

      A.  The Cases Should Be Dismissed Because They Were Not Filed in Good Faith........ 32

         i.  The Debtors Filed for Chapter 11 Protection as a Litigation Tactic...................... 33

         ii.  These Chapter 11 Filings Had No Legitimate Bankruptcy Purpose...................... 35

ACTIVE 26523724v1 08/04/2014

B.   Alternatively,  Dismissal Is Warranted Because
The Petitions Were Not Duly Authorized.................................................................. 38

**CONCLUSION .......................................................................................................... 40**

ACTIVE 26523724v1 08/04/2014

Table of Authorities

**Page(s)**

C ases

15375 Mem'l Corp. v. Bepco, L.P.,
    589 F.3d 605 (3d Cir. 2009) ........................................................................32, 36

Argus Grp. 1700, Inc. v. Steinman (In re Argus Grp. 1700, Inc.),
    206 B.R. 757 (E.D. Pa. 1997) ...............................................................................33

C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC Ave. P'ship),
    113 F.3d 1304 (2d. Cir. 1997) ..............................................................................32

Carbon Capital II Real Estate CDO 2005-1 Ltd. v. Shubh Hotels Pittsburgh, LLC (In re
    Shubh Hotels Pittsburgh, LLC),
    No. BR 10-26337 JAD, 312, 2011 WL 7145601 (W.D. Penn. Feb. 1, 2011) ........30

Carolin Corp. v. Miller,
    886 F.2d 693 (4th Cir. 1989) ................................................................................32

Commodity Futures Trading Comm'n v. Weintraub,
    471 U.S. 343 (1985)..............................................................................................20

Crescive Landscape Mgmt. v. PHDC, LLC (In re PHDC, LLC),
    No. 03-93397, 2004 Bankr. LEXIS 1113 (Bankr. N.D. Ga. Apr. 28, 2014) ..........23

Furness v. Lilienfield,
    35 B.R. 1006 (D. Md. 1983) .................................................................................33

Gomez v. U.S. Tr.,
    No. 7:09-CV-00496, 2010 WL 582706 (W.D. Va. Feb. 18, 2010) ........................22

Hotel Assocs., Inc. v. Trs. of Cent. States SE & SW Areas Pension Fund (In re Hotel
    Assocs., Inc.),
    3 B.R. 343 (Bankr. E.D. Pa. 1980) .......................................................................28

In re AG Serv. Ctrs., L.C.,
    239 B.R. 545 (Bankr. W.D. Mo. 1999)..................................................................26

In re Al-Wyn Food Distribs., Inc.,
    8 B.R. 42 (Bankr. M.D. Fla. 1980) .......................................................................38

In re Am. Int'l Indus., Inc.,
    10 B.R. 695 (Bankr. S.D. Fla. 1981)......................................................................38

In re Arkco Props., Inc.,
    207 B.R. 624 (Bankr. E.D. Ark. 1997) ..................................................................38

In re The Bible Speaks,
    74 B.R. 511 (Bankr. D.Mass.1987) ...................................................................31

In re Biolitec, Inc.,
    No. 13-11157, 2013 WL 1352302 (Bankr. D.N.J. Apr. 3, 2013) ......................................20, 26

In re Brandon Farmer's Mkt. Inc.,
    34 B.R. 148 (Bankr. M.D.Fla. 1983) ......................................................................38

In re Cardinal Indus., Inc.,
    109 B.R. 755 (Bankr. S.D. Ohio 1990)....................................................................30

In re Colorado-Ute Electric Ass'n, Inc.,
    120 B.R. 164 (Bankr. D. Colo. 1990) .................................................................27, 31

In re ComScape Telecomms., Inc.,
    423 B.R. 816 (Bankr. S.D. Ohio 2010)...................................................................39

In re Concord Coal Corp.,
    11 B.R. 552 (Bankr. S.D.W.Va. 1981) ...................................................................28

In re Evans,
    48 B.R. 46 (Bankr. W.D. Tex. 1985)..................................................................28, 29

In re Giggles Rest., Inc.,
    103 B.R. 549 (Bankr. D.N.J. 1989) ......................................................................37

In re Great Nw. Dev. Co.,
    28 B.R. 141 (Bankr. E.D. Mich. 1983)...................................................................38

In re HBA E., Inc.,
    87 B.R. 248 (Bankr. E.D.N.Y. 1988)....................................................................34

In re Intercat, Inc.,
    247 B.R. 911 (Bankr. S.D. Ga. 2000) ...............................................................23, 25

In re Ionosphere Clubs, Inc.,
    113 B.R. 164 (Bankr. S.D.N.Y. 1990)...................................................................29

In re Jayo,
    No. 06-20051, 2006 WL 2433451 (Bankr. D. Idaho July 28, 2006) ......................................22

In re Marvel Entm't Grp., Inc.,
    140 F.3d 463 (3d Cir. 1998)........................................................................20, 26, 30

In re McCorhill Publ'g, Inc.,
    73 B.R. 1013 (Bankr. S.D.N.Y. 1987) ..............................................................20, 23

iv

In re N2N Commerce, Inc.,
    405 B.R. 34 (Bankr. D. Mass. 2009) ...................................................................39

In re Nugelt, Inc.,
    142B.R. 661 (Bankr. D. Del. 1992) ....................................................................31

In re Parker Grande Development, Inc.,
    64 B.R. 557 (Bankr. S.D. Ind. 1986) ..................................................................28

In re PRS Ins. Grp., Inc.,
    274 B.R. 381 (Bankr. D. Del. 2001) ...................................................................22

In re Ravick Corp.,
    106 B.R. 834 (Bankr. D.N.J. 1989) ...............................................................33, 36

In re Rivermeadows Assoc., Ltd.,
    185 B.R. 615 (Bankr. D. Wyo. 1995) .................................................................27

In re Sharon Steel Corp.,
    86 B.R. 455 (Bankr. W.D. Pa. 1988), aff'd, 871 F.2d 1217 (3d Cir. 1989) ...........................31

In re Sharon Steel Corp.,
    871 F.2d 1217 (3d Cir. 1989)......................................................................23, 25

In re Stingfree Techs., Inc.,
    No. 08-16232bf, 2009 Bankr. LEXIS 3023 (Bankr. E.D. Pa. Feb. 4, 2009), aff'd, 427
    B.R. 337 (E.D. Pa. 2010) ..........................................................................34, 35

In re SunCruz Casinos, LLC,
    298 B.R. 821 (Bankr. S.D. Fla. 2003).................................................................20

In re V. Savino Oil & Heating Co.,
    99 B.R. 518 (Bankr. E.D.N.Y. 1989)..............................................................26, 27

In re Wings Digital Corp.,
    No. 05-12117, 2005 WL 3789334 (Bankr. S.D.N.Y. May 16, 2005) .....................................28

In re Zebranek & Doughten P.A.,
    No. 01-04461-6B7, 2001 WL 1825793 (Bankr. M.D. Fla. July 31, 2001) ..............................38

Marsch v. Marsch (In re Marsch),
    36 F.3d 825 (9th Cir. 1994) .........................................................................32

Microwave Products of America, Inc., 102 B.R. 666 (Bankr. W.D. Tenn. 1989) .................28, 30

Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze),
    434 F.3d 222 (3d Cir. 2006)..........................................................................35

v

NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom
    Express, Inc.),
    384 F.3d 108 (3d Cir. 2004) ........................................................................................32

Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.),
    200 F.3d 154 (3d Cir. 1999)..........................................................................32, 33, 35

Petit v. New England Mortg. Servs. Inc.,
    182 B.R. 64 (D. Me. 1995) ...............................................................................23, 31

Price v. Gurney,
    324 U.S. 100 (1945).............................................................................................38

Tradex Corp. v. Morse,
    339 B.R. 823 (D. Mass. 2006) ...........................................................................26

United States Mineral Prod. Co. v. Official Comm. of Asbestos Bodily Injury & Prop.
    Damage Claimants (In re United States Mineral Prod. Co.),
    No. 03-956, 2004 U.S. Dist. LEXIS 673 (D. Del. January 16, 2004), aff'd, 105 Fed.
    App'x 428 (3d Cir. 2004)...................................................................................29

Winter v. Bel-Aire Invs., Inc. (In re Bel-Aire Investments, Inc.),
    97 B.R. 88 (Bankr. M.D. Fla. 1989) .................................................................38

## STATUTES

11 U.S.C. § 105(a) ....................................................................................................4

11 U.S.C. § 1104(a) ...............................................................................................1, 4

11 U.S.C. § 1104(a)(1)...................................................................................... passim

11 U.S.C. § 1104(a)(2)...................................................................................... passim

11 U.S.C. § 1104(c) ................................................................................................39

11 U.S.C. § 1112(b) .......................................................................................... passim

11 U.S.C. § 1112(b)(4) ...........................................................................................31

28 U.S.C. § 157.......................................................................................................4

28 U.S.C. § 157(b)(2)...............................................................................................4

28 U.S.C. §1334.......................................................................................................4

28 U.S.C. § 1408.......................................................................................................4

28 U.S.C. §1409.......................................................................................................4

ACTIVE 26523724v1 08/04/2014

Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. .............................................................................34

**OTHER AUTHORITIES**

H.R. Rep. No. 95-595 at 405-06 (1977), <u>reprinted in </u>1978 U.S.C.C.A.N. 5963, 6361-62 ...........32

Bartronics Asia Pte. Ltd. ("**BAPL**"), by and through its undersigned counsel, respectfully submits this *Brief in Support of its Motion For Entry of an Order (I) Directing the Appointment of a Chapter 11 Trustee*; *or in the Alternative, (II) Dismissing the Chapter 11 Cases* (the "**Motion**").  By this Motion, BAPL seeks the appointment of a Chapter 11 Trustee for the above-captioned cases (the "**Cases**") filed by Cloudeeva, Inc., a Delaware corporation ("**Cloudeeva Delaware**") and Cloudeeva, Inc., a Florida corporation ("**Cloudeeva Florida**," and together with Cloudeeva Delaware, the "**Debtors**"[1]), pursuant to 11 U.S.C. § 1104(a); or, in the alternative, dismissal of the Cases pursuant to 11 U.S.C. § 1112(b).  In support of the Motion, BAPL, the majority shareholder of Cloudeeva Florida and a creditor of Cloudeeva Delaware,[2] respectfully states as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, BAPL seeks the appointment of a trustee because Adesh Tyagi, a convicted felon and the purported CEO and Chairman of the Debtors, cannot be trusted to act as a fiduciary of the Debtors and their estates during the course of these Cases.  In fact, Tyagi, who pled guilty in 2012 to grand theft embezzlement, was facing the very real risk of being forcibly removed from his position of control when he caused these Chapter 11 petitions to be filed on the eve of a hearing in the Superior Court of California (the "**California Court**") on BAPL's motion to appoint a receiver to take over the management of Cloudeeva Delaware (the "**Receiver Motion**").

---

[1]  The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Cloudeeva, Inc. a Delaware Corporation (5326) and Cloudeeva, Inc., a Florida Corporation (2227).  Cloudeeva, Inc., a Delaware Corporation's corporate headquarters are located at 104 Windsor Center Drive, Suite 300, East Windsor, New Jersey 08520.

[2]  BAPL is owed approximately $6 million from Cloudeeva Delaware in connection with working capital loans it made to Cloudeevea Delaware and its predecessor entity, Bartronics America, Inc.

1

2.     BAPL filed the Receiver Motion at the invitation of the California Court after Tyagi depleted the assets of Cloudeeva Delaware (the operating Debtor), began fraudulently transferring its business and diverting its receivables to a competing company under his direct or indirect control, and repeatedly defied orders issued by the California Court directing Tyagi to limit Cloudeeva Delaware's borrowing and to make certain detailed disclosures to BAPL.  In fact, in a scathing order entered earlier this year, the California Court expressed its frustration that its orders had been "stretched, summarily revised, or ignored by Cloudeeva," and advised the parties that Tyagi's "continuing violations of disclosure requirements reasonably can be inferred to be an attempt to hide internal company transactions."

3.     Recognizing that the California Court would no longer tolerate his continued refusal to act in the best interests of the Debtors, and would almost certainly direct the appointment of a receiver, Tyagi caused the commencement of these Cases not for any legitimate purpose, but solely to delay being ousted from control of the Debtors' business.  Thus, Tyagi did not cause the Debtors to commence the Cases with any intent to use the Chapter 11 process to reorganize, but merely to buy time to finish siphoning off Cloudeeva Delaware's only remaining valuable assets, or to exert sufficient pressure to extract a payment from BAPL in exchange for relinquishing control of the company.

4.     Like the Receiver Motion, the instant Motion seeking, *inter alia*, the appointment of a Chapter 11 trustee, was made necessary by Tyagi's self-dealing, gross mismanagement of Cloudeeva Delaware, and multiple violations of an injunction and other court orders issued in California to protect Cloudeeva Delaware from these very acts.  Indeed, Tyagi has operated Cloudeeva Delaware in such a manner as to lose $2.3 million in net working capital for the six month period between October 2013 and April 2014, and has turned a thriving business under

2

BAPL's control into one that, under Tyagi's control, is apparently unable to meet its payroll obligations and has resorted to factoring its accounts receivable at an exorbitant expense. As the majority shareholder of Cloudeeva Florida (the 99% owner of Cloudeeva Delaware), BAPL therefore seeks to take control of the company out of Tyagi's hands to avoid further harm to the Debtors.

5.        Specifically, as detailed below, the appointment of a Chapter 11 trustee is necessary because Tyagi has, *inter alia*, (i) a shocking history of engaging in dishonest and fraudulent conduct, including, among other examples of moral turpitude, a criminal conviction for a $4.8 million foreclosure scheme fraud; (ii) grossly mismanaged the Debtors' business by, among other destructive actions, setting up and funding a new company managed by Tyagi's wife that competes with Cloudeeva Delaware, and to which Tyagi has transferred substantial Cloudeeva Delaware funds and customers; (iii) incurred huge professional and break-up fees in connection with an ill-conceived leveraged buyout that would have leveraged the business's assets beyond any ability to pay, and would likely have destroyed the Debtors rather than benefited them; (iv) wasted Cloudeeva Delaware's money on lavish and personal expenditures, including child support payments, travel, hotels, limousines and dining; and (v) paid inflated fees to an Indian company owned by his father for the same back office work that was done by another company for tens of thousands of dollars less per month before Tyagi effectuated a corporate coup and gained control of the business.

6.        As an alternative to the appointment of a Chapter 11 trustee, BAPL seeks the dismissal of these Cases on the grounds that (i) they were not filed in good faith, but merely as a litigation tactic, and (ii) they were commenced by Tyagi without proper corporate authority after he unilaterally and unlawfully installed himself as the Debtors' purported Chairman and CEO.

ACTIVE 26523724v1 08/04/2014

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334 and the Standing Order of Reference to the Bankruptcy Court Under Title 11 dated as of

September 18, 2012 (Simandle, C.J.).  Venue is proper in this District pursuant to 28 U.S.C. §§

1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

8.      The statutory predicates for the relief sought herein are Sections 105(a), 1104(a)

and 1112(b) of Title 11 of the United States Code (the "**Bankruptcy Code**").

## STATEMENT OF FACTS

**A.      Tyagi Fraudulently Induces the Stock Exchange Agreement.**

9.      In mid to late 2012, Tyagi was introduced to BAPL, a Singapore corporation

engaged in the business of owning and managing information technology companies.

Declaration of Venkata Putta ("**Putta Decl.**") ¶ 2.  One such company was Bartronics America,

Inc. ("**BAI**"), a technology staffing and consulting business that in 2012 earned more than $36

million in revenues from operations.  Putta Decl. ¶¶ 1, 10.

10.     In order to induce BAPL to transfer its interests in BAI to a Tyagi-controlled

company, *i.e.*, Systems America, Inc. ("**SA Florida**"), Tyagi made numerous fraudulent

representations about the financial condition of SA Florida, including by: (i) providing financial

statements from SA Florida representing that the company had more than $850,000 in cash as of

September 30, 2012, when it actually had only $1,774 as of that date;  (ii) misrepresenting that

SA Florida earned income exceeding $2.5 million, when actual gross revenue was in fact just

over $775,000; (iii) misrepresenting that all corporate filings and legal requirements of SA

Florida were in order as of the date of the transaction, when SA Florida had not filed an income

tax return or a payroll tax return for two years; (iv) failing to disclose an SEC investigation into

4

SA Florida, of which Tyagi had received notice in July 2011; and (v) failing to disclose an investigation by the Indian Securities Exchange Commission into an alleged $3.8 million swindle by Tyagi against Citicorp, in which investigators found probable cause to pursue a fraud claim against Tyagi.  Putta Decl. ¶ 7(E)-(I).

11.     In addition, prior to the transaction, Tyagi failed to disclose to BAPL the critical and material fact that he had been convicted of grand theft of $4.8 million (in the context of a commercial transaction) just eight months before signing the Stock Exchange Agreement, and that a warrant for his arrest had been issued in the State of Nevada for writing $925,000 in fraudulent checks to Caesars Palace Hotel.  Putta Decl. ¶ 7(A)-(C).  To the best of BAPL's knowledge, that arrest warrant remains outstanding.  Further, Tyagi failed to disclose his 2004 indictment for passing bad checks in Nevada to cover a gambling debt, as well as a $60,000 default judgment entered against him by Harvey's Casino Hotel, also stemming from an unpaid gambling debt.  Putta Decl. ¶ 7(D).

12.     Based on Tyagi's many representations and material omissions (including his failure to inform BAPL of his very recent criminal past), BAPL entered into the Stock Exchange Agreement with SA Florida, pursuant to which BAPL transferred all of its holdings in BAI (now Cloudeeva Delaware) to SA Florida (now Cloudeeva Florida) in exchange for 62 percent of the stock of SA Florida, representing a majority interest in the company.  Putta Decl. ¶ 6.  As a result of the Stock Exchange Agreement (which BAPL was seeking to rescind, based on Tyagi's fraud, at the time the Debtors' bankruptcy petitions were filed), BAPL is the majority owner of Cloudeeva Florida, the Debtor holding company whose primary (if not only) valuable asset is its operating company, *i.e.*, Debtor Cloudeeva Delaware.

13.     Concurrently with their execution of the Stock Exchange Agreement, the parties also signed a Stockholders' Agreement which provided, among other things, that Cloudeeva Florida would have five directors, consisting of (i) Tyagi, (ii) a representative of BAPL, and (iii) three directors jointly approved in writing by Tyagi and BAPL.  Putta Decl. ¶ 6, Exh. 6.

**B.      Tyagi Unlawfully Takes Control of the Debtors.**

14.     In the Stockholders' Agreement dated December 7, 2012, the parties agreed on a procedure for the appointment of a director designated by BAPL, as follows:

> 2.  Board of Directors; Representation.  (a) The parties agree that the Board of Directors of the Company [Cloudeeva Florida] shall consist of (i) Tyagi, (ii) one representative designated by Bartronics (the "Bartronics Director"), and (iii) three additional directors whom both Tyagi and the Bartronics Director approve in writing (the "additional Directors").  Concurrently with the execution and delivery hereof, the parties will cause the Board of Directors to consist of Tyagi and the Bartronics Representative….(c) The Bartronics Director may only be removed with the consent of Bartronics, and his replacement shall be appointed at the direction of Bartronics.

Putta Decl. ¶ 6, Exh. 6.

15.     The Stockholders' Agreement does not grant Tyagi any veto power or approval rights with respect to BAPL's designated director.  Nor does the Stockholders' Agreement require any vote to confirm BAPL's appointed director.  To the contrary, the Stockholders' Agreement specifically excludes the appointment of directors from corporate actions requiring a vote, as follows:

> Other Matters Submitted to Vote of Stockholders:  (a) The parties agree that, except as to Board of Directors matters covered in Section 2, and an Approved Sale of the Company covered by Section 4, with respect to all matters submitted to the vote of holders of common stock either at meeting duly called and held for such purpose…

Putta Decl. ¶ 6, Exh. 6.

6

16.     BAPL's appointment of Srinivas Yella as a director of Cloudeeva Florida was critical to carrying out the parties' intent under the Stock Exchange Agreement and related transactions, in which the parties agreed that BAPL would retain control of the operations of its valuable business, *i.e.*, Cloudeeva Delaware (formerly BAI), including by exercising its right to appoint a director to the board of Cloudeeva Florida.  Putta Decl. ¶ 9.  In fact, for approximately seven months after the transaction, Tyagi had *no role* in the management of Cloudeeva Delaware.

17.     By July 2013, it was clear to BAPL that Tyagi was not successfully carrying out his role of raising capital and entering into binding commitments with suitable merger/acquisition targets.  Putta Decl. ¶ 8.  At a meeting in Singapore to discuss Tyagi's failure to perform, Tyagi signed an agreement entitled "Principles of Understanding" in which he agreed not to take any corporate action or sign any documents on behalf of Cloudeeva Delaware.  Id., Exh. 20.

18.     However, shortly after signing the Principles of Understanding, Tyagi began to take unilateral and unauthorized steps to illegally usurp sole control of Cloudeeva Delaware and its assets, and to lock out BAPL, which was the company's majority owner.  Putta Decl. ¶ 9.  Among other things, when BAPL appointed Yella as its board member for Cloudeeva Florida pursuant to the Stockholders' Agreement, Tyagi refused to recognize Yella's authority as a director.  Id.  Instead, claiming to be the sole director of Cloudeeva Florida, Tyagi purported to execute a unanimous consent of the board of directors of Cloudeeva Florida as the "sole member of the board of directors," in which he appointed himself the sole director of Cloudeeva Delaware.  Id., Exh. 22.  As the purported sole director of Cloudeeva Delaware, Tyagi then signed a unanimous consent of the board of directors of Cloudeeva Delaware, in which he fired

7

all of the company's officers and purported to appoint himself as the company's sole officer.  <u>Id.</u>, Exh. 23.

19.    Tyagi's written resolutions were invalid because they were executed without the consent or knowledge of BAPL's appointed director of Cloudeeva Florida, and because Tyagi was prohibited from implementing these self-interested transactions over the objection of Cloudeeva Florida's majority shareholder, BAPL.  Nonetheless, these unlawfully executed and legally ineffective resolutions constitute the sole basis upon which Tyagi claims to be in control of the Debtors, and to have commenced these Cases.

**C.**    **<u>BAPL Commences Litigation Against Tyagi.</u>**

20.    After learning of Tyagi's unauthorized and unilateral actions summarized above, on or about July 29, 2013, BAPL—by its prior counsel—filed a complaint against Tyagi in the Superior Court of New Jersey, Mercer County, asserting claims for fraud, conversion, breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing arising out of Tyagi's misconduct (the "**<u>First New Jersey Action</u>**").  Declaration of Elizabeth Pappy ("**<u>Pappy Decl.</u>**") ¶ 2.  Also on July 29, 2013, BAPL—by its prior counsel—submitted a letter brief in support of an application for a temporary restraining order and preliminary injunction restraining Tyagi from, among other things, withdrawing any funds from accounts maintained on behalf of Cloudeeva Delaware.  Pappy Decl. ¶ 3.  Critically, however, upon commencing the First New Jersey Action, BAPL was unaware of Tyagi's criminal past, including his admitted theft of $4.8 million, and the existence of warrants for his arrest for writing nearly $1 million worth of fraudulent checks to casinos.  <u>Id</u>.

21.    At a July 31, 2013 hearing in the First New Jersey Action on the temporary restraining order application, the New Jersey Superior Court advised former counsel for BAPL

that it appeared that BAPL's claims, based on the manner in which they were alleged, should have been asserted as a derivative action to support the injunctive relief requested.  Pappy Decl. ¶ 3.  As such—and without the benefit of knowing what BAPL has since discovered about Tyagi's criminal history—the Court declined to issue a temporary restraining order.  However, because the company's bank accounts had been frozen by the bank after Tyagi and BAPL asserted competing claims regarding control, the company could not pay its employees.  Thus, the parties submitted an order, signed on consent by counsel to Tyagi and former counsel to BAPL, pursuant to which the parties agreed, among other things, that (i) pending further order of the Court, Tyagi would be recognized as Chairman and CEO of Cloudeeva Delaware and would be able to pay its employees, and (ii) Tyagi would provide weekly notice to BAPL of any transfer of funds into or out of any accounts held in the name of Cloudeeva Delaware.  Pappy Decl. ¶ 4, Exh. A.

22.     Shortly after the TRO hearing, BAPL learned of, among other things, Tyagi's $4.8 million grand theft and the outstanding arrest warrants for writing nearly $1 million in bad checks to casinos.  Thus, before Tyagi answered or otherwise moved in response to the operative complaint in the First New Jersey Action, it was determined that BAPL's direct remedy and standing arose out of the Stock Exchange Agreement, i.e., to seek, *inter alia*, rescission of that Agreement due to the fraud of Tyagi and Cloudeeva Florida.  Pappy Decl. ¶ 5.

23.     Section 9.9(a) of the Stock Exchange Agreement provides for private arbitration in San Jose, California of all disputes arising out of or in connection with the Agreement.  Section 9.8 of the Stock Exchange Agreement provides that the rights of the parties shall be governed by the laws of California.  Putta Decl., Exh. 5.  In light of the mandatory arbitration clause and the California forum selection clause, and because Tyagi had not yet answered or

9

moved in response to the operative New Jersey complaint, on September 12, 2013, BAPL voluntarily dismissed the First New Jersey Action without prejudice and without objection from Tyagi or the entities under his control.  Pappy Decl. ¶ 5.  Thus, contrary to the statement made by Cloudeeva to this Court that the New Jersey Superior Court dismissed BAPL's claims, at no time did the Superior Court issue any substantive ruling on the merits of those claims.  Id.

D.     **The California Court Grants a Preliminary Injunction in Favor of BAPL.**

24.     After voluntarily dismissing the First New Jersey Action, BAPL filed a complaint in the California Superior Court seeking to rescind the Stock Exchange Agreement by reason of Tyagi's fraudulent inducement (the "**California Action**").  Putta Decl. ¶ 10, Exh. 25.  The California Action was filed in aid of a JAMS arbitration in accordance with the aforementioned mandatory arbitration provision in the Stock Exchange Agreement.  Prior to the commencement of these Cases, the arbitration had been scheduled to be held from August 12, 2014 through August 20, 2014, with a decision to be entered shortly thereafter.

25.     After extensive briefing and a full hearing, on October 15, 2013, the Honorable James L. Stoelker of the California Superior Court (the "**California Court**") granted a preliminary injunction in BAPL's favor, finding, *inter alia*, that there was a reasonable probability that BAPL would succeed on the merits of its claims asserted in the California Action, including for rescission of the Stock Exchange Agreement.   Putta Decl. ¶ 10, Exh. 28.  Specifically, the California Court observed that "there is sufficient evidence so that it is reasonably probable to conclude that Mr. Tyagi's qualifications, including criminal convictions for fraud, were material to the original agreement."  Id.

26.     Pursuant to the preliminary injunction in place in California, as subsequently modified, Tyagi and the Debtors were restrained from (i) transferring or disposing of any assets

of Cloudeeva Delaware for purposes outside the ordinary course of the company's business; (ii) encumbering any assets of Cloudeeva Delaware or using its assets as collateral for any loan; and (iii) reorganizing or merging Cloudeeva Delaware and/or Cloudeeva Florida with any other companies.  Putta Decl., Exhs. 28, 30.  In addition, Tyagi was required to prepare and provide to Mr. Yella (BAPL's board appointee) copies of bank statements, checks, and other records demonstrating the business purpose of any expenditures by Cloudeeva Delaware, and to keep Mr. Yella informed of all business plans prior to consummation and/or prospective transactions that could substantially impact the company's assets.  Id.  As detailed below, however, Tyagi repeatedly and wilfully violated the preliminary injunction.

E.    **Tyagi Repeatedly Violates Orders of the California Court
      And Otherwise Mismanages the Debtors' Business.**

27.    Tyagi has brazenly disregarded the preliminary injunction and other orders of the California Court to the detriment of Cloudeeva Delaware, and has otherwise grossly mismanaged the company's business.

28.    First, notwithstanding the preliminary injunction's restrictions on borrowing and a subsequent order by the California Court capping Cloudeeva Delaware's borrowing against its accounts receivable at $2.5 million through May 2014, Cloudeeva Delaware borrowed $7.66 million between March and May 2014, at an interest cost of at least $220,000 to $275,000.  Putta Decl. ¶ 12(F), Exh. 43.

29.    Second, Tyagi appears to have diverted at least $750,000 from Cloudeeva Delaware to a company founded by Tyagi and managed by his wife, and he has begun to re-direct Cloudeeva Delaware's customers and accounts receivable to this competing company.  Putta Decl. ¶ 12(H)(iii).

11

30.     Third, Cloudeeva Delaware has continued to violate the preliminary injunction by, *inter alia*, making payments outside the ordinary course of business, including by (i) purchasing a D&O policy for $192,390, evidently to protect Tyagi and others against claims of misconduct; (ii) leasing a brand new Lexus automobile for in-house counsel at a cost of $2,700 per month; (iii) spending tens of thousands of dollars on travel, hotels, limousines, and dining for Tyagi, Cloudeeva Delaware officer Mark Vitcov, and their wives and friends, including for trips to New York, London, Vancouver, Napa and other destinations; (iv) paying $20,000 in bonuses, despite the company's dire financial condition; (v) purchasing more than $42,000 in anonymous prepaid "airline points" without explanation; and (vi) using $140,000 of Cloudeeva Delaware funds to pay Tyagi's personal attorneys' fees, which Tyagi has been ordered by the California Court to return to the company.  See Putta Decl. ¶ 12, Exhs. 48, 49, 50; Exhibit A to BAPL's Objection to First Day Motions [Docket No. 20].

31.     Fourth, Tyagi violated the injunction prohibiting the encumbrance of assets of Cloudeeva Delaware other than in the ordinary course of business by commencing negotiations to acquire an eastern European company called S&T AG.  Putta Decl. ¶ 11(E).  The transaction made no business sense, as it would have required Tyagi to raise $200 million and to buy S&T AG using Cloudeeva Delaware as collateral.  Id.  Tyagi spent tens of thousands of dollars in professional fees exploring this transaction which would have violated the preliminary injunction.  Id.  Moreover, a $1.6 million claim by S&T AG against Cloudeeva Delaware exists in the form of an alleged break-up fee for Cloudeeva Delaware's failure to close on the S&T AG acquisition, notwithstanding that Cloudeeva Delaware's CFO, hand-picked by Tyagi, swore in a declaration that there would be no fee if the transaction was not consummated.  Id., Exh. 39.

12

32.     Fifth, Tyagi made a $195,000 payment—using Cloudeeva Delaware funds—to a company that he owned called Local Information Services ("LIS").  The Debtors did no business with LIS, which essentially has been defunct since 2004.  Putta Decl. ¶ H(i).

33.     Sixth, Tyagi has been sending money to Cloudeeva India, a company apparently owned by his father, for allegedly performing administrative functions for Cloudeeva Delaware. Payments to Cloudeeva India have exceeded, by tens of thousands of dollars a month, fees paid to the company that had previously performed the same functions for Cloudeeva Delaware before Tyagi's corporate coup.  Putta Decl. ¶ H(ii).

**F.      Tyagi Wastes Company Funds on Frivolous Litigation.**

34.     Debtors have made the completely unfounded assertion that BAPL's litigious behavior is the cause of the Debtors' troubled financial condition.  However, it is Tyagi's unrestrained spending on frivolous lawsuits solely for harassment purposes that has damaged the Debtors.  To wit, and as discussed below, since BAPL filed the California action, Tyagi has caused to be filed multiple lawsuits concerning issues already subject to litigation in California, and also filed harassment suits against BAPL's California counsel and against prior Cloudeeva employees.  As a result, hundreds of thousands of dollars in legal fees and costs related to these frivolous lawsuits have been incurred.

35.     For example, after BAPL dismissed the First New Jersey Action and commenced the California Action in aid of the JAMS arbitration, Tyagi caused the Debtors to assert cross-claims in the California Court and commenced a second action in New Jersey Superior Court in which the Debtors asserted virtually identical claims (the "**Second New Jersey Action**").  Putta Decl. ¶ 31.  In November 2013, BAPL filed a motion to dismiss, stay, or transfer the Second New Jersey Action on the grounds that, *inter alia*, the claims asserted were the subject of a first-

13

filed action in California.    The Debtors opposed that motion, which remains pending.

Notwithstanding that the Debtors' claims asserted in the Second New Jersey Action were also

asserted in the California case that was to proceed to arbitration in August 2014, in May 2014 the

Debtors served extensive discovery requests in the Second New Jersey Action, including more

than 90 interrogatories, upon BAPL and various other defendants in that case.  When BAPL filed

a motion to stay discovery in light of the previously scheduled arbitration of the California

Action, the Debtors again opposed the stay.  In short, rather than conserving costs, the Debtors

presumably spent considerable funds attempting to force BAPL to defend identical claims

simultaneously in both California and New Jersey.

36.    In addition, in November 2013, the Debtors commenced a separate action in New

Jersey Superior Court—in which Tyagi is the only named defendant—purporting to seek a

declaratory judgment concerning the conversion price of an alleged convertible note issued to

Tyagi by SA Florida in August 2007 (the "**Declaratory Judgment Action**").  Putta Decl. ¶

12(D), Exh. 36; Pappy Decl. ¶¶ 16-17.  The Debtors and Tyagi (who, not surprisingly, filed an

answer admitting virtually all of the allegations asserted by the Debtors) allege that Tyagi is

owed more than $400,000 on the convertible note, and that if Tyagi is permitted to convert the

note into shares of Cloudeeva Delaware, he would replace Cloudeeva Florida (and thus BAPL)

as the majority owner of the company.  BAPL filed a motion to intervene in the Declaratory

Judgment Action, which was granted as unopposed.

37.    Aside from the absurdity of an action in which the Debtors, who are controlled

solely by Tyagi, purport to assert a claim against Tyagi, the alleged more than $400,000

purportedly owed to Tyagi on the convertible note that is the subject of the Declaratory

Judgment Action was not disclosed to BAPL prior to the Stock Exchange Agreement, and did

14

not appear on SA Florida's September 30, 2012 financial statements. In fact, based on BAPL's analysis, it appears that as of December 2012 when the Stock Exchange Agreement was executed, Tyagi was owed no money by SA Florida, and in fact owed the company more than $140,000. Pappy Decl., ¶ 17. It thus appears that Tyagi caused the commencement of the Declaratory Judgment Action in yet another attempt to undermine the intent of the parties upon executing the Stock Exchange Agreement by locking BAPL out of control if its valuable business. Pursuant to the case management order, as amended, fact discovery in the Declaratory Judgment Action is scheduled to be completed by August 14, 2014.[3]

38.    In total, since BAPL commenced the California action, Tyagi, in full control of the Debtors, has caused to be filed no fewer than four separate lawsuits stemming from issues that were already the subject of litigation in California, including the Second New Jersey Action, a lawsuit against BAPL's California counsel, and a cross-action against a California law firm that had sued the Debtors to recover unpaid attorneys' fees. Pappy Decl. ¶ 39.

39.    Significantly, the Debtors' unnecessary litigation spending did not even stop upon the commencement of these Cases. At a hearing on the Debtors' first day motions on July 23, 2014, Debtors' counsel advised this Court that the Debtors intended to remove the various state court actions to this Court to avoid "the overwhelming costs of litigating what are very similar issues among similar parties." See Transcript of July 23, 2014 Hearing 12-13. The Debtors immediately removed the California arbitration proceedings (against the Debtors) to the California U.S. District Court, and have since moved to transfer those proceedings to this Court. However, contrary to counsel's representation to this Court on July 23, 2014, on July 30, 2014,

---

[3] Notably, when BAPL served a deposition notice on or about July 11, 2014, scheduling Tyagi's deposition for July 22, 2014, counsel to the Debtors advised BAPL that Tyagi could not appear for a deposition in New Jersey, and insisted that he could only be deposed in California or by telephone. Yet, on July 23, 2014, Tyagi was present before this Court at a hearing on the Debtors' first day motions.

counsel to the Debtors in the Second New Jersey Action informed counsel to BAPL that the Debtors were "not yet making a decision to remove this matter to the Bankruptcy Court." Pappy Decl. ¶ 41, Exh. O. It thus appears that the Debtors intend to continue litigating the Second New Jersey Action—in which they assert claims virtually identical to those asserted in the now removed California action—in the New Jersey Superior Court. Indeed, the day after these Cases were commenced, the Debtors filed a motion in the Second New Jersey Action to, *inter alia*, reinstate the complaint against certain defendants who had been dismissed for lack of service, authorize the Debtors to serve additional defendants by substituted service, and to compel discovery. Pappy Decl. ¶ 41, Exh. P.

**G.   Cloudeeva Delaware's Declining Performance Under Tyagi's Control.**

40.    Not surprisingly in light of, *inter alia*, Tyagi's looting, unlawful diversion of business to related companies under his direct or indirect control, and wasteful litigation spending, Cloudeeva Delaware's performance has materially declined under Tyagi's control.

41.    As noted, Tyagi has operated Cloudeeva Delaware in such a manner as to lose $2.3 million in net working capital for the six month period between October 2013 and April 2014.

42.    In addition, as discussed below, notwithstanding that BAI never needed to factor receivables before Tyagi unlawfully took over control of the company, under Tyagi's control, Cloudeeva Delaware has factored receivables in an amount exceeding $7.5 million in violation of the California Court's order and at exorbitant cost to the company. Upon the appointment of a Chapter 11 trustee in these Cases, BAPL is prepared to facilitate any debtor-in-possession financing (on more advantageous terms) that may be necessary to stabilize the Debtors' business while it recovers from the damage done by Tyagi.

16

43.     The Debtors' representation to this Court that their declining performance was somehow caused by BAPL is meritless.  First, with respect to the Debtors' allegations of misstatements on BAI's balance sheet prior to the Stock Exchange Agreement, Tyagi identifies two receivables as misstated: a $14.9 million receivable owed by a company called Veneta, and an $11.8 million receivable from a company called Exxova.  Not only did Tyagi fully understand the nature of these items before he signed the Stock Exchange Agreement, but they were also immaterial to his decision to do so, as the parties had agreed that the notes to Veneta and Exxova would be transferred out of BAI because Tyagi wanted a balance sheet that reflected no intercompany transactions.  Putta Decl. ¶ 13.

44.     Tyagi's allegations that the Debtors' financial difficulties are also somehow connected to the fact that certain administrative functions in India were denied to him are similarly unfounded.  What Tyagi fails to note is that any discontinuation of those services resulted from Tyagi's own failure to pay for them.  In fact, Tyagi used these purported disruptions, which resulted from his failure to pay, as a pretext for transferring the administrative functions to a company owned by Tyagi's father.  Even with less volume of work being generated by the company, the Debtors' financial disclosures make it clear that they are now paying nearly twice the amount to Tyagi's father's company than was paid to the company that previously provided these services.  Putta Decl. ¶ 13(C).

45.     Finally, Tyagi's claim that the Debtors' decline is due, in part, to BAI spending or improperly incurring expenses after the Stock Exchange Agreement was signed is false.  Indeed, every transaction about which Tyagi now complains was reflected on the company's books, fully disclosed to Tyagi, and represented a known and legitimate business expense.  For example, Tyagi complains about a payment of approximately $532,000 to BAPL.  That payment was made

pursuant to a written, revolving loan agreement between BAI and BAPL.  Likewise, the payment of $562,000 to Bartronics Global Solutions was for administrative services for Cloudeeva Delaware before Tyagi diverted those functions to the company owned by his father.  As noted, the fees paid to Bartronics Global Solutions were significantly less than what Tyagi is now paying his father's company for the same services.  Similarly, the payments made to Infokall and Wizcom resulted from legitimate business relationships.  In sum, all of the transactions that Tyagi now questions constituted legitimate business expenses, and caused no harm to the Debtors' business.  Putta Decl. ¶ 13.

## H.    Upon the Invitation of the California Court, BAPL Moves to Appoint a Receiver.

46.    On May 14, 2014, the California Court entered an order, *inter alia*, denying Cloudeeva's motion seeking an extension of time to continue factoring receivables.  Putta Decl., Exh. 43.  In the May 14, 2014 Order, the California Court noted that Cloudeeva's original application to authorize factoring "made misstatements concerning the anticipated costs of factoring," and that the "costs of factoring are considerably greater than stated."  In addition, the California Court highlighted Cloudeeva's failure to comply with certain conditions imposed by that Court "as a minimum requirement for obtaining the authority to factor receivables."  Specifically, the California Court noted that "Cloudeeva exceeded the maximum quarterly interest costs allowed by the court and did not make contemporaneous reports to Bartronics stating the amount generated by the factoring, the costs associated therewith and the identity of the payees and in what amounts."  As a result, the California Court expressed concern that "it is possible that some of the amounts generated were used for a purpose other than paying billable employees and administration."  The California Court concluded that "it is unlikely that Cloudeeva will strictly comply with reasonable conditions imposed to allow further factoring."

18

47.    In addition to denying Cloudeeva's request for an extension of time to factor receivables, the California Court's May 14, 2014 Order addressed a motion by BAPL to compel Cloudeeva to comply with prior court orders.  In addressing the latter motion, the California Court harshly criticized Cloudeeva's conduct, as follows:

> The parties should carefully note that the first preliminary injunction was sought by Bartronics to prevent looting, dissipation or misuse of company assets by Adesh Tyagi and Cloudeeva management.  Originally, Bartronics believed that the best way to prevent this threat was to freeze the company business pending the arbitration.  More recently, Bartronics asked the court to appoint a receiver to independently manage the business.  This court denied both requests on the principle that by complete, thorough and timely reporting, the company business would continue under Cloudeeva.  Bartronics could be assured that no misadventure (or worse) had befallen the company assets.  Given the mistrust existing, complete and robust reporting was called for by Cloudeeva. ***Unfortunately, all the while insisting that it is operating properly and even profitably, Cloudeeva consistently has avoided as much of its reporting responsibilities as possible***.  This naturally has only further exacerbated further suspicions of Mr. Tyagi's self-dealing and has led to "surmises" which may or may not be justified.  The current motion reflects such frustration of Bartronics that it asks the court to jail Mr. Tyagi until all the reporting is completed to its satisfaction.  ***Some of this frustration is shared by the court which is mindful that its orders are stretched, summary revised, or ignored by Cloudeeva.***

Putta Decl., Exh. 43.

48.    The California Court went on to order Cloudeeva to make numerous disclosures to BAPL.  These included weekly disclosures of all funds spent by the company, without redactions.  Id.

49.    Finally, while the California Court declined to order Mr. Tyagi's incarceration, it found "that continuing violations of disclosure requirements reasonably can be inferred to be an attempt to hide internal company transactions."  Therefore, the California Court explained that "[u]nder those circumstances the court will re-visit the motion to appoint a receiver during the remainder of this action, either on it[s] own motion or on the motion of plaintiff [BAPL]."  Id.

19

50.    On July 9, 2014, at the invitation of the California court, BAPL filed the Receiver

Motion seeking to remove Tyagi from his control position at Cloudeeva Delaware.  As noted

above, the Receiver Motion was scheduled to be heard at 8:30 a.m. on July 22, 2014—just hours

after Tyagi caused the Debtors to file these Chapter 11 petitions on July 21, 2014 (the "**Petition**

**Date**").

## ARGUMENT

## I.    A Chapter 11 Trustee Should be Appointed to Protect the Debtors' Estates.

51.    Courts will leave a debtor-in-possession only where current management "can be

depended upon to carry out the fiduciary responsibilities of a trustee." Commodity Futures

Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985) (citation and internal quotation marks

omitted).  Where, as here, a debtor-in-possession is incapable of performing these duties, or

when creditors' confidence evaporates, a Chapter 11 trustee must be appointed.  See In re Marvel

Entm't Grp., Inc., 140 F.3d 463, 473-74 (3d Cir. 1998) (affirming appointment of trustee in light

of "'deep-seeded conflict and animosity' between the [debtor] and the Lenders" where creditors

lacked confidence that those in control of debtors could act as fiduciaries); In re Biolitec, Inc.,

No. 13-11157, 2013 WL 1352302, at *12 (Bankr. D.N.J. Apr. 3, 2013) (appointing trustee due in

part to management's inability "to act as a disinterested fiduciary for the estate [and] maintain

the confidence of creditors"); In re McCorhill Publ'g, Inc., 73 B.R. 1013, 1017 (Bankr. S.D.N.Y.

1987) ("where there are questionable inter-company financial transfers and the principals of the

debtor occupy conflicting positions in the transferee companies, a trustee should be appointed in

the best interests of creditors").  It has thus been said that "in the appropriate case, the

appointment of a trustee is a power which is critical for the Court to exercise in order to preserve

the integrity of the bankruptcy process and to insure that the interests of creditors are served."  In

ACTIVE 26523724v1 08/04/2014

re SunCruz Casinos, LLC, 298 B.R. 821, 828 (Bankr. S.D. Fla. 2003) (quoting In re Intercat,

Inc., 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000)).

52.    Section 1104(a)(1) of the Bankruptcy Code provides for the mandatory

appointment of a trustee for "cause."  See 11 U.S.C. § 1104(a)(1).  Alternatively, Section

1104(a)(2) affords a court discretion to appoint a trustee in the absence of cause where such

appointment is in the best interests of creditors, equity holders and other interests of the estate.

See 11 U.S.C. § 1104(a)(2).  As discussed below, not only does "cause" exist to mandate the

appointment of a trustee in these Cases, but the appointment of a trustee will also serve the best

interests of all parties.  Therefore, the appointment of a trustee is warranted under both Section

1104(a)(1) and 1104(a)(2).

      **A.    There is Ample "Cause" to Support the
Mandatory Appointment of a Trustee Under 11 U.S.C. § 1104(a)(1).**

53.    Section 1104(a)(1) of the Bankruptcy Code provides for the mandatory

appointment of a Chapter 11 trustee where current management, *inter alia*, grossly mismanages

the debtor's business or engages in fraud or dishonesty.  Specifically, Section 1104(a)(1)

provides, in pertinent part, as follows:

> The court shall order the appointment of a trustee:
>
> > (1) for cause, including fraud, dishonesty, incompetence, or gross
> > mismanagement of the affairs of the debtor by current management, either
> > before or after the commencement of the case, or similar cause, but not
> > including the number of holders of securities of the debtor or the amount
> > of assets or liabilities of the debtor.

See 11 U.S.C. § 1104(a)(1).  As discussed below, mandatory appointment of a Chapter 11 trustee

in these Cases is proper because Tyagi has a history of engaging in fraud and dishonesty, and has

grossly mismanaged the affairs of the Debtors.

i.    **A Trustee is Necessary Because Tyagi is a Convicted Felon With a History of Fraudulent and Dishonest Business Dealings.**

54.    There can be no reasonable dispute that Tyagi is unfit to serve as a fiduciary of the Debtors' estates—and that mandatory appointment of a Chapter 11 trustee is warranted—in light of the fact that he is a convicted felon who pled guilty to a $4.8 million fraud in 2012. Indeed, a criminal conviction provides the basis for appointment of a trustee where, as here, the offense involves "some measure of fraud, deception and/or dishonesty." Gomez v. U.S. Tr., No. 7:09-CV-00496, 2010 WL 582706, at *2 (W.D. Va. Feb. 18, 2010); see also In re Jayo, No. 06-20051, 2006 WL 2433451, at *8 (Bankr. D. Idaho July 28, 2006) (recognizing that guilty plea as to crime involving knowing disposition and conversion with intent to defraud "falls within the express language of § 1104(a)(1)").

55.    Tyagi's 2012 guilty plea to felony embezzlement, a crime plainly involving elements of fraud, is thus sufficient, on its own, to necessitate the appointment of a trustee under Section 1104(a)(1), which explicitly includes fraud and dishonesty as grounds for the mandatory appointment of a trustee.

56.    Not only did Tyagi plead guilty to a felony in 2012, but in December 2004, Tyagi was indicted for passing checks with insufficient funds to pay off a gambling debt to a Nevada casino. In August 2009, a criminal complaint against Tyagi was issued for passing a check with insufficient funds with intent to defraud in the amount of $925,000 to pay off a gambling debt to a Nevada casino. In December 2009, a default judgment was levied against Tyagi resulting from an additional gambling debt that remained unpaid. In addition, an investigation by the Indian Securities Exchange Commission found probable cause to go forward with a fraud claim against Tyagi arising out of an alleged $3.8 million swindle by Tyagi against Citicorp. In sum, Tyagi's

22

history of criminal conduct involving fraudulent financial transactions mandates the appointment

of a trustee in these Cases.

### ii. A Trustee is Necessary Because Tyagi is Engaged in Self-Dealing.

57.     Courts have frequently held that a debtor's misuse of corporate assets constitutes

grounds for mandatory appointment of a trustee under Section 1104(a)(1). See, e.g., In re PRS

Ins. Grp., Inc., 274 B.R. 381, 387-88 (Bankr. D. Del. 2001) (debtor's failure to satisfactorily

explain alleged diversion of assets from debtor's subsidiary to its president and sole shareholder

and misuse of corporate assets, including for the personal expenses of the president, constituted

grounds for appointment of a trustee).  Such misconduct warrants the appointment of a trustee

because where management has engaged in diverting assets or business to related companies to

the detriment of the estate, such diversion "raises grave questions about current management's

ability to fulfill its fiduciary duty as debtor-in-possession to [the debtors'] creditors."   In re

Sharon Steel Corp., 871 F.2d 1217, 1228 (3d Cir. 1989) (affirming appointment of trustee where

debtors' management systematically siphoned assets to other companies under common control).

58.     Specifically, the diversion of assets and business to related persons and companies

necessitates the appointment of a trustee because it renders management incapable of

disinterestedly prosecuting claims to recover transfers to, inter alia, their family members and

related entities.   Intercat, 247 B.R. at 915-20; see also McCorhill Publ'g, 73 B.R. at 1017

("where there are questionable inter-company financial transfers and the principals of the debtor

occupy conflicting positions in the transferee companies, a trustee should be appointed");

Crescive Landscape Mgmt. v. PHDC, LLC (In re PHDC, LLC), No. 03-93397, 2004 Bankr.

LEXIS 1113, at *20-21 (Bankr. N.D. Ga. Apr. 28, 2014) (where debtor had made payments

potentially recoverable as preferential transfers to entities also managed by the debtor's manager,

23

court appointed trustee to, *inter alia*, ensure that the preference claims would be investigated);
Petit v. New England Mortg. Servs. Inc., 182 B.R. 64, 70 (D. Me. 1995) (affirming trustee
appointment where "bankruptcy court held serious concerns regarding whether the Debtor could
be relied upon to pursue and recover any fraudulent transfers on behalf of remaining creditors").

59.    Here, the evidence demonstrates that Tyagi has misappropriated substantial
company funds for his own personal use, and has engaged in diverting Cloudeeva's business to
related entities under common control.  Further, Tyagi has diverted Cloudeeva's back-office
business to a firm owned by Tyagi's father.  The fees paid to that firm exceed, by tens of
thousands of dollars per month, the fees that Cloudeeva Delaware paid to another company for
the same services before Tyagi took control.  In addition, Tyagi has engaged in costly, frivolous
litigation, spent money on lavish personal expenditures, and even used company money to pay
his child support obligations and his personal legal fees.  It is beyond debate that appointment of
a trustee is needed to put a halt to Tyagi's misuse of corporate funds and self-dealing.

60.    Even though the Cases are in their infancy, Tyagi has already demonstrated that
he intends to use the Chapter 11 process to continue his self-dealings to the detriment of the
estate.  For example, as part of their first day motions, the Debtors attempted to hoodwink this
Court into immediately authorizing the payment of $145,000 to undisclosed "foreign vendors,"
without disclosing in the motion that they intended to pay Cloudeeva India Private Ltd., a
company owned by Tyagi's father.  See Motion for Entry of an Order Authorizing, But Not
Directing, the Debtors to Pay Certain Pre-Petition Claims of Certain Foreign Vendors [Docket
No. 9].  Moreover, the Debtors have also sought approval to borrow millions of dollars under a
factoring agreement, at exorbitant rates, purportedly to address a "liquidity crisis."  But the
budget provided by the Debtors indicates that they will, instead, use those borrowings to pay,

24

*inter alia*, "incentive" payments to officers (presumably including Tyagi) of over $70,000 per month, $40,000 in "travel" expenses per month for executives, and $145,000 per month to Tyagi's father's company.    See Exhibit I to Motion for Approval of Proposed Factoring Agreement and Order Authorizing Immediate Factoring [Docket No. 12].    The immediate appointment of a trustee is thus critical to prevent Tyagi from doing irreparable damage to the Debtors' business.

**iii.    A Trustee is Necessary Because Tyagi Has
Grossly Mismanaged the Debtors' Business.**

61.    In accordance with Section 1104(a)(1), bankruptcy courts routinely appoint chapter 11 trustees where a debtor's current management is guilty of gross mismanagement. See, e.g., Sharon Steel, 871 F.2d at 1221 (affirming appointment of trustee on basis of gross mismanagement including, *inter alia*, where debtor became so cash poor that it was forced to enter into a " high-interest working capital loan"); In re Intercat, Inc., 247 B.R. at 922 (manager guilty of incompetence or mismanagement warranting appointment of trustee by, *inter alia*, "charging thousands of dollars of purely personal travel expenses to the corporation [and] causing the corporation to deduct his personal expenses as business expenses").

62.    As discussed above, prior to Tyagi's unlawful takeover of the operations of the Debtors in July 2013, BAI was a very successful business that generated more than $36 million in revenues from operations in 2012.  The Debtors' current situation is thus especially distressing to BAPL.  Tyagi's gross mismanagement of the Debtors' business is evidenced by, among other things, (i) the loss of $2.3 million in net working capital for the six month period between October 2013 and April 2014; (ii) the factoring of receivables and borrowing in an amount exceeding $7.5 million between March and May 2014, notwithstanding that BAI *never* resorted to factoring when it was under the control of BAPL; and (iii) the waste of corporate assets on

25

lavish and personal expenditures of management. This rapid decline in the business of the

Debtors and waste of its corporate assets is *prima facie* evidence of Tyagi's mismanagement,

necessitating the appointment of a trustee.

**iv.    A Trustee is Necessary Because
Tyagi Routinely Defies Court Orders.**

63.    Although "Section 1104(a)(1) does not specifically list 'noncompliance with court

orders' or 'failure to comply with the Bankruptcy Code' as causes for the appointment of a

trustee…such conduct clearly falls within the scope circumscribed by the statute either as a

'similar cause' or as a permutation of 'incompetence, or gross management.'" In re AG Serv.

Ctrs., L.C., 239 B.R. 545, 550 (Bankr. W.D. Mo. 1999) (citation omitted). Therefore, the

violation of preliminary injunctions or other orders issued by courts in other proceedings

supports the appointment of a Chapter 11 trustee. See Biolitec, Inc., 2013 WL 1352302 at *11-

12 (in granting motion to appoint trustee, considering fact that entity under common control and

ownership with debtor completed a merger in apparent violation of an injunction ordered by a

Massachusetts court).

64.    As already noted, Tyagi has repeatedly disregarded orders issued by the

California Court, leading that Court to express its frustration that "its orders are stretched,

summary revised, or ignored by Cloudeeva." This history of disregarding and flagrantly

violating court orders is of particular concern here, as Cloudeeva's violations involved, among

other things, the refusal to make ordered disclosures to BAPL, leading the California Court to

conclude that Cloudeeva's "continuing violations of disclosure requirements reasonably can be

inferred to be an attempt to hide internal company transactions."

65.    Tyagi's failure to disclose necessary information in violation of court orders

warrants the appointment of a trustee because "honest and straightforward disclosure…is

26

intrinsic to the entire reorganization process." In re V. Savino Oil & Heating Co., 99 B.R. 518,

526 (Bankr. E.D.N.Y. 1989) (debtor's failure to disclose relevant information regarding its

business and customers, as well as its affirmative efforts to misrepresent or conceal such

important matters warranted appointment of a trustee); see also Tradex Corp. v. Morse, 339 B.R.

823, 834 (D. Mass. 2006) (where debtor fails to disclose material and relevant information to the

court and creditors, appointment of a trustee is required); Marvel, 140 F.3d at 474 (failure to

make "[o]pen, honest and straightforward disclosure to the Court and creditors" would fall short

of complying with fiduciary obligations) (quoting V. Savino Oil, 99 B.R. at 526).

66.    Significantly, this Court need not (and should not) wait to appoint a trustee until

the Debtors defy this Court's orders concerning, among other things, the disclosure of

information, as prepetition misconduct alone is sufficient to warrant the appointment of a trustee.

See 11 U.S.C. § 1104(a)(1) (the relevant "cause" for appointment of a trustee may exist "*either

before or after* the commencement of the case") (emphasis added); In re Rivermeadows Assoc.,

Ltd., 185 B.R. 615, 619 (Bankr. D. Wyo. 1995) ("the Code is clear that the prepetition conduct

of the debtor's management may be the sole deciding factor" in the appointment of a Chapter 11

trustee); V. Savino Oil, 99 B.R. at 526 ("[t]his pre-petition course of conduct, in and of itself,

constitutes 'cause' for the appointment of a Chapter 11 trustee."); In re Colorado-Ute Electric

Ass'n, Inc., 120 B.R. 164, 175 (Bankr. D. Colo. 1990) ("if the facts and circumstances warrant

the appointment of a trustee, it is not appropriate to wait to file the motion . . . . Such a deferral

will only further delay the progress toward the effective rehabilitation and reorganization of the

debtor."). Accordingly, the appointment of a trustee is necessary because Tyagi cannot be

trusted to comply with orders of this Court, including, *inter alia*, the Court's mandate that

Debtors must disclose certain information about its spending to the U.S. Trustee and BAPL.

**B.      Alternatively, This Court Should Appoint a Trustee In The
Interests of the Estates and All Other Parties Under 11 U.S.C. § 1104(a)(2).**

67.     As noted above, even absent a finding of "cause" justifying the mandatory

appointment of a Chapter 11 trustee, Section 1104(a)(2) of the Bankruptcy Code creates a

flexible standard whereby the court shall appoint a trustee where it is in the best interests of the

creditors and the estate.  Indeed, 1104(a)(2) provides, in pertinent part, as follows:

> The court shall order the appointment of a trustee:
>
> > (2) if such appointment is in the interest of creditors, any equity
> > security holders and other interest of the estate, without regard to the
> > number of holders of the securities of the debtor or the amount of
> > assets or liabilities of the debtor.

See 11 U.S.C. § 1104(a)(2).

68.     In exercising their broad equitable powers to appoint a trustee under Section

1104(a)(2), bankruptcy courts "eschew rigid absolutes and look to the practical realities and

necessities inescapably involved in reconciling competing interests."  Hotel Assocs., Inc. v. Trs.

of Cent. States SE & SW Areas Pension Fund (In re Hotel Assocs., Inc.), 3 B.R. 343, 345

(Bankr. E.D. Pa. 1980); see also In re Wings Digital Corp., No. 05-12117, 2005 WL 3789334, at

*5 (Bankr. S.D.N.Y. May 16, 2005) (noting that Section 1104(a)(2) is a "lesser standard" than

Section 1104(a)(1)).

69.     When determining whether the appointment of a trustee is in the best interests of

creditors and the estate, courts consider a variety of factors, including: (i) the trustworthiness of

the debtor, In re Evans, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985); (ii) the debtor-in-possession's

past and present performance and prospects for the debtor's rehabilitation, In re Parker Grande

Development, Inc., 64 B.R. 557, 561 (Bankr. S.D. Ind. 1986); (iii) the confidence – or lack

thereof – of the business community and of creditors in present management, In re Concord Coal

28

Corp., 11 B.R. 552, 554 (Bankr. S.D.W.Va. 1981); and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment, <u>Microwave Products of America, Inc.</u>, 102 B.R. 666, 675 (Bankr. W.D. Tenn. 1989).  Here, all of these factors weigh in favor of appointing a trustee.

70.    As detailed above, the Debtors in this case are entirely untrustworthy, as they are currently managed by Tyagi, who is a convicted felon with a history of fraudulent business dealings.  Further undermining Tyagi's trustworthiness are the considerable indications that he has begun to divert money and business away from the Debtors to a competing company managed by his wife, and has used corporate assets to pay for personal luxuries.  Tyagi's unfitness to serve as a fiduciary weighs in favor of the appointment of a trustee.  <u>See</u> <u>Evans</u>, 48 B.R. at 48 (appointing trustee under Section 1104(a)(2) where trustworthiness of the debtor was in doubt).

71.    Moreover, the Debtors' performance has dramatically declined since Tyagi usurped control of the business, as evidenced by the sharp decline in net working capital, and the fact that Cloudeeva Delaware has resorted to factoring its receivables, at a significant and unwarranted expense, to borrow millions of dollars to make payroll.  Thus, the Debtors' past and present performance under the control of Tyagi weighs in favor of the appointment of a trustee in the interests of creditors.  <u>In re Ionosphere Clubs, Inc.</u>, 113 B.R. 164, 170 (Bankr. S.D.N.Y. 1990) (appointing trustee "especially" under Section 1104(a)(2) due to debtor's failure to formulate viable business plan and in light of continued enormous operating losses); <u>Evans</u>, 48 B.R. at 49 (appointing trustee under Section 1104(a)(2) where historic poor performance provided little to no evidence that debtor was capable of a successful reorganization).

ACTIVE 26523724v1 08/04/2014

72.     Also weighing heavily in favor of the appointment of a trustee is the lack of trust between BAPL and Tyagi, who have been engaged in contentious litigation in numerous proceedings for more than a year.  Indeed, in December 2013, the California Court noted that it was "clear to the Court that the distrust and suspicion between the parties will remain unabated whatever the terms of the preliminary injunction."  See Putta Decl., Exh. 34.  This continuing distrust weighs in favor of the appointment of a trustee.  See United States Mineral Prod. Co. v. Official Comm. of Asbestos Bodily Injury & Prop. Damage Claimants (In re United States Mineral Prod. Co.), No. 03-956, 2004 U.S. Dist. LEXIS 673 at * 9 (D. Del. January 16, 2004), aff'd, 105 Fed. App'x 428 (3d Cir. 2004) (appointment of trustee warranted as a result of animosity and distrust among the parties); Carbon Capital II Real Estate CDO 2005-1 Ltd. v. Shubh Hotels Pittsburgh, LLC (In re Shubh Hotels Pittsburgh, LLC), No. BR 10-26337 JAD, 312, 2011 WL 7145601, at *4 (W.D. Penn. Feb. 1, 2011) (appointing a trustee in light of the animosity between the debtor-in-possession and its lenders that led to distracting and costly litigation); In re Cardinal Indus., Inc., 109 B.R. 755, 767 (Bankr. S.D. Ohio 1990) (appointing trustee under Section 1104(a)(2) where debtors' self-dealing and breach of fiduciary duties resulted in a serious erosion of trust and confidence by creditors and where benefits of potential claims against insiders of estate outweighed any cost of appointing a trustee); Microwave Prods. of Am., 102 B.R. at 673 (appointing trustee under Section 1104(a)(2) "based in part on the considerable and continuing erosion of confidence in the debtor and its board of directors to operate the company").

73.     As Debtors' counsel acknowledged at the July 23, 2014 first day hearing, "at the end of the day, what we have here is a difficult shareholder dispute."  Transcript of July 23, 2014 First Day Hearing, p. 16, lines 7-8.  Significantly, BAPL is the only economic party in interest

(other than the factoring lender) that has appeared in these Cases, and no official committee of unsecured creditors has been appointed.    Therefore, and even apart from Tyagi's criminal convictions, violations of court orders, self-dealings and other malfeasance, the deep-seeded animosity and distrust between the parties will cause these Cases to be mired in gridlock so long as Tyagi remains in control of the Debtors.

74.    Simply stated, the circumstances of these Cases cry out for the appointment of a trustee.    See Marvel, 140 F.3d at 475 ("the district court's lengthy account of this complex bankruptcy case, in which 'the parties are sharply divided on many issues, and are presently incapable of resolving them,' supported its exercise of discretion to appoint a trustee"); Petit, 182 B.R. at 70 ("deep-seeded conflict and animosity between a debtor and its creditors provides a basis for the appointment of a trustee"); Colorado-Ute Elec. Assoc., Inc., 120 B.R. at 176 (appointment of trustee in interests of parties where "serious conflicts ... between and among the debtor, its board and creditors [made] the prospect for gridlock seem more probable than the ability to rehabilitate the debtor"); In re The Bible Speaks, 74 B.R. 511, 512 (Bankr. D. Mass. 1987) (appointing trustee when "friction [had] developed between the Debtor and the Creditors' Committee which threaten[ed] to engulf this estate in costly and legalistic bickering over the entire range of the reorganization process").

75.    In sum, the benefits of a trustee who would take control of the Debtors out of Tyagi's hands far outweigh the costs.    See In re Sharon Steel Corp., 86 B.R. 455, 466 (Bankr. W.D. Pa. 1988) (noting that "the cost of having a trustee in place is insignificant when compared with…the enormous benefit to be achieved by the establishment of trust and confidence in . . . management."), aff'd, 871 F.2d 1217 (3d Cir. 1989).

## II.  In The Alternative to Appointing a Trustee, The Chapter 11 Cases Should Be Dismissed.

76.     Bankruptcy Code Section 1112(b) provides that "[o]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause." 11 U.S.C. § 1112(b).   Bankruptcy Courts "have wide latitude in determining whether cause exists to convert or dismiss" a Chapter 11 case.   In re Nugelt, Inc.,142 B.R. 661, 665 (Bankr. D. Del. 1992).  Although Section 1112(b)(4) of the Bankruptcy Code identifies certain examples of "cause" for dismissal of a Chapter 11 case, a bankruptcy court is not constrained by the statute's enumerated examples, and may find "cause" based on the facts and circumstances of the particular Chapter 11 case.  See Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.), 200 F.3d 154, 160 (3d Cir. 1999); Carolin Corp. v. Miller, 886 F.2d 693, 699 (4th Cir. 1989).[4]

77.     As explained below, dismissal of these Cases is warranted because they were not commenced in good faith, and because they were commenced without the requisite corporate authority.

### A.     The Cases Should Be Dismissed Because They Were Not Filed in Good Faith.

78.     Although Congress did not enumerate "bad faith" in the non-exclusive list of "causes" justifying dismissal under Section 1112(b), courts have overwhelmingly held that "a Chapter 11 petition is subject to dismissal for 'cause' under 11 U.S.C. § 1112(b) unless it is filed in good faith."  In re SGL Carbon Corp., 200 F.3d at 162; see also Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994); C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC Ave. P'ship), 113

---

[4] The legislative history of section 1112(b) of the Bankruptcy Code also indicates that the list set forth in sections 1112(b)(4)(A)-(P) of the Bankruptcy Code is nonexclusive, such that a bankruptcy court has the ability to dismiss a Chapter 11 case for any reason cognizable to its equitable powers.  See H.R. Rep. No. 95-595 at 405-06 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6361-62

F.3d 1304 (2d. Cir. 1997); Carolin Corp, 886 F.2d at 698.  The burden is on the party filing the

chapter 11 petition to establish that it was filed in good faith.  NMSBPCSLDHB, L.P. v. Integrated

Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108, 118 (3d Cir. 2004).

79.    Determining whether a petition for Chapter 11 was filed in good faith is a fact-

specific undertaking.  The Third Circuit has focused on two primary overlapping areas of inquiry,

namely, (i) whether the petition was filed to obtain a tactical litigation advantage; and (ii) whether the

petition serves a valid bankruptcy purpose.  See 15375 Mem'l Corp. v. Bepco, L.P., 589 F.3d 605,

618 (3d Cir. 2009) (citing SGL Carbon Corp, 200 F.3d at 165).  For the reasons explained below, the

Cases should be dismissed.

### i.    The Debtors Filed for Chapter 11 Protection as a Litigation Tactic.

80.    Filing a Chapter 11 petition merely to obtain tactical litigation advantages is not

within "the legitimate scope of the bankruptcy laws." SGL Carbon Corp., 200 F.3d at 165.  As

this Court has previously explained, "[g]enerally, where a debtor's reorganization effort involves

essentially a two party dispute resolvable in state court, and the filing for relief under the

Bankruptcy Code is intended to frustrate the legitimate efforts of creditors to enforce their rights

against the debtor, dismissal for 'cause' is warranted." In re Ravick Corp., 106 B.R. 834, 844

(Bankr. D.N.J. 1989).  Courts typically dismiss Chapter 11 petitions where such abuse of the

bankruptcy system is evident.  See Argus Grp. 1700, Inc. v. Steinman (In re Argus Grp. 1700,

Inc.), 206 B.R. 757, 765-66 (E.D. Pa. 1997) (dismissing chapter 11 case filed to obtain

alternative forum for two-party dispute based on state law); Furness v. Lilienfield, 35 B.R. 1006,

1013 (D. Md. 1983) ("The Bankruptcy [Code] provisions are intended to benefit those in genuine

financial distress. They are not intended to be used as a mechanism to orchestrate pending

litigation.").

33

81.    In the instant Cases, the factual circumstances leading up to the filings make it abundantly clear that Tyagi's primary, if not sole, purpose for commencing the Cases was to escape the litigation and arbitration proceedings pending in California.  As detailed above, Tyagi commenced the Cases on the eve of a hearing in the California Court on BAPL's motion to appoint a receiver to take control of Cloudeeva Delaware.  In light of the California Court's scathing commentary on Tyagi's repeated violations of its Orders, and its assertion that it would consider appointing a receiver on its own motion or on a motion by BAPL, at the time these cases were commenced Tyagi was on the verge of being ousted from control of the Debtors in favor of a receiver.  Indeed, BAPL's Receiver Motion was scheduled to be heard at 8:30 a.m. on July 22, 2014, *i.e.*, the morning after these Chapter 11 petitions were filed.

82.    Moreover, the California arbitration in which BAPL sought to rescind the Stock Exchange Agreement was scheduled to take place between August 12, 2014 and August 20, 2014.  As also discussed above, in granting a preliminary injunction in BAPL's favor, the California Court concluded that there was a reasonable probability that BAPL would succeed on the merits of its claims asserted in the California action, including for rescission of the Stock Exchange Agreement, in light of Tyagi's criminal past.  Therefore, prior to the commencement of these Cases, even absent the appointment of a receiver, Tyagi was on the verge of losing control of the Debtors by rescission of the Stock Exchange Agreement.

83.    Simply put, the timing of these Chapter 11 filings was not coincidental.  Faced with the immediate appointment of a receiver and just weeks before the arbitration was scheduled to proceed, Tyagi filed these petitions in a last ditch effort to preserve his control over the Debtors.  "As a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation

34

tactic, the petition may be dismissed as not being filed in good faith."  In re HBA E., Inc., 87

B.R. 248, 259-60 (Bankr. E.D.N.Y. 1988).

84.    Similarly, bankruptcy courts are inclined to dismiss Chapter 11 cases where the

issues at the heart of the bankruptcy proceedings are more appropriately decided through

arbitration.  See In re Stingfree Techs., Inc., No. 08-16232bf, 2009 Bankr. LEXIS 3023, at *47

(Bankr. E.D. Pa. Feb. 4, 2009), aff'd, 427 B.R. 337 (E.D. Pa. 2010).  In fact, by virtue of the

Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., bankruptcy courts have no discretion to refuse to

enforce a contractually entered arbitration clause.  Therefore a Chapter 11 debtor in possession is

bound by a prepetition agreement to arbitrate.  Mintze v. Am. Gen. Fin. Servs., Inc., (In re

Mintze), 434 F.3d 222, 233 (3d Cir. 2006).  Where issues at the heart of a bankruptcy proceeding

properly belong in arbitration, especially where the petition was filed in order to specifically

avoid arbitration, it is appropriate for the court to dismiss the bankruptcy proceedings under

Bankruptcy Code Section 1112(b).  See In re Stingfree, 2009 Bankr. LEXIS 3023 at *63

(dismissing chapter 11 case where its "primary activity" was for the debtor to litigate claims

"based largely…upon state law claims that are arbitrable").  Here, the Cases were filed only

weeks before the start of an arbitration hearing in California to determine whether the SEA will

be unwound.  If it is, then BAPL will regain full ownership of Cloudeeva Delaware (the

operating Debtor) and Tyagi will have no continuing ownership interest in that entity.  Dismissal

of the Cases is therefore warranted so that the arbitration can go forward.

**ii.    These Chapter 11 Filings Had No Legitimate Bankruptcy Purpose.**

85.    Even ignoring the strategic motivations for filing these Chapter 11 petitions, aside

from the sweeping statements of general hardship in Tyagi's first day declaration, the Debtors

have produced no evidence demonstrating that filing for Chapter 11 protection was a necessary

measure, or that the Debtors will, in fact, legitimately benefit from these proceedings through a

reorganization.  As the Third Circuit explained in SLG Carbon Corp.:

> Chapter 11 vests petitioners with considerable powers - the automatic stay, the
> exclusive right to propose a reorganization plan, the discharge of debts, etc. -
> that can impose significant hardship on particular creditors. When financially
> troubled petitioners seek a chance to remain in business, the exercise of those
> powers is justified. But this is not so when a petitioner's aims lie outside those
> of the Bankruptcy Code…*if a petitioner has no need to rehabilitate or
> reorganize, its petition cannot serve the rehabilitative purpose for which
> Chapter 11 was designed.*

200 F.3d at 165-66 (emphasis added).

86.    In short, "[d]ismissal of a case is appropriate where a case is not filed to achieve

the valid, legitimate purposes of the rehabilitate provisions of Chapter 11."  Ravick Corp., 106

B.R. at 843.

87.    Here, the Debtors have failed to identify any "reorganization-related purpose" for

the filing of the Cases.  Indeed, "[a] party filing for Chapter 11 bankruptcy may prove that its

petition served a valid bankruptcy purpose by showing that the petition preserv[ed] a going

concern or maximiz[ed] the value of the debtor's estate."  15375 Mem'l Corp., 589 F.3d at 619

(citations and internal quotation marks omitted).  The Debtors have not done so.   In fact, it

appears the Debtors have *jeopardized* their value by commencing the Cases, given the reports

that customers are threatening to cancel their contracts as a result of the bankruptcy filing.  See

Transcript of July 23, 2014 First Day Hearing, at 22-27. (Debtors' counsel:  "[B]ecause this is a

service business, it's been in Chapter 11 for less than two days at this point, but we're already

hearing rumblings from customers attempting to cancel contracts under some backup clauses.  I

mean we can certainly come in here and argue that it's a violation of stay, you can't cancel our

contact, but because it's a relationship business it's not a real win because, you know, once

they're done with the consultants that they have they won't seek additional consultants.").

88.    Moreover, Tyagi's excessive spending preceding the bankruptcy filings demonstrates that the Debtors' purported justification for filing--*i.e.*, that costs of the ongoing litigation were so great as to create a liquidity crises--is merely a pretext.   In the months leading up to the filing of these cases, not only did Tyagi deplete the Debtors' assets through personal misuse of company funds, diverting business contracts away from the Debtor, and entering into a factoring agreement that substantially increased the Debtors' debt obligations, but he also engaged in an array of unnecessary and frivolous legal measures at great cost to the Debtors. These actions are plainly inconsistent with intent to use the bankruptcy process for a legitimate, reorganizational purpose.

89.    In fact, the Debtors' actions following the commencement of the Cases prove that their purported justification for filing is entirely a ruse.   At the first day hearing, Debtors' counsel represented to the Court that the Debtors would be removing the various litigations in California and New Jersey to this Court, noting "the overwhelming costs of litigating what are very similar issues among similar parties."   See Transcript of July 23, 2014 First Day Hearing, at 12-13. Although the Debtors immediately removed the California arbitration proceedings (against the Debtors) to the District Court and have moved to transfer those proceedings to this Court, the Debtors have not removed the New Jersey actions in which the Debtors are the plaintiffs.   In fact, after filing the Chapter 11 petitions, on July 22, 2014, the Debtors filed a motion in the Second New Jersey Action to, *inter alia*, reinstate a defendant who had previously been dismissed from the case for lack of service, obtain authorization to serve additional defendants by substituted service, and to compel discovery.   On July 30, 2014, and contrary to counsel's representation to this Court on July 23, 2014, Debtors' in-house counsel advised counsel to BAPL that the Debtors are "not yet making a decision to remove [the Second New Jersey

ACTIVE 26523724v1 08/04/2014

Action] to the Bankruptcy Court," and that "[i]f and until such removal notice is sent to the Court

in this matter, if it is ever sent, the matter is to proceed…"  Pappy Decl., Exh. O.

90.    Because the Debtors did not file these Cases for a good faith purpose, they should

be dismissed.

**B.    Alternatively, Dismissal Is Warranted Because
The Petitions Were Not Duly Authorized.**

91.    It is well settled that where a bankruptcy filing is not properly authorized, it

should be dismissed.  See, e.g., In re Giggles Rest., Inc., 103 B.R. 549 (Bankr. D.N.J. 1989)

(holding that the bankruptcy court lacked jurisdiction over a voluntary Chapter 11 proceeding

because the board resolution authorizing the filing was invalid); In re Al-Wyn Food Distribs.,

Inc., 8 B.R. 42 (Bankr. M.D. Fla. 1980) (granting a motion by creditors to dismiss a voluntary

Chapter 11 petition on the grounds that the petition had been filed by the president of the

corporation without authorization by the corporate debtor's board of directors); In re Great Nw.

Dev. Co., 28 B.R. 141 (Bankr. E.D. Mich. 1983) (dismissing a voluntary bankruptcy petition

when the debtor failed to demonstrate that the requisite number of directors voted in favor of the

filing of the Chapter 7 petition); In re Am. Int'l Indus., Inc., 10 B.R. 695 (Bankr. S.D. Fla. 1981)

(dismissing bankruptcy case filed without authority by corporation's president); In re Arkco

Props., Inc., 207 B.R. 624, 628 (Bankr. E.D. Ark. 1997) (dismissing jointly administered Chapter

11 cases because the director who filed for Chapter 11 on behalf of the debtors had not been

validly appointed, and therefore had held no authority to file).

92.    Under Supreme Court precedent, a bankruptcy court must look to local law to

determine whether a bankruptcy petition was duly authorized. Price v. Gurney, 324 U.S. 100,

106 (1945).  Courts interpreting the law of both Delaware and Florida, where the Debtors are

incorporated, have held that a bankruptcy filing must be authorized by the majority vote of a

38

corporation's board of directors unless otherwise provided by the corporation's organizational documents. See In re Zebranek & Doughten P.A., No. 01-04461-6B7, 2001 WL 1825793, at *2 (Bankr. M.D. Fla. July 31, 2001); Al-Wyn, 8 B.R. at 43 (a "president of a corporation has no general power to file a petition, nor is such a power implied."); Winter v. Bel-Aire Invs., Inc. (In re Bel-Aire Investments, Inc.), 97 B.R. 88, 90 (Bankr. M.D. Fla. 1989) (dismissing a Chapter 11 filing that was entered by one of two directors acting without proper agreement between the two); In re Brandon Farmer's Mkt. Inc., 34 B.R. 148 (Bankr. M.D.Fla. 1983) (holding that, under Florida law, a debtor's president who was one of two board directors was not authorized to unilaterally file a Chapter 11 petition); In re N2N Commerce, Inc., 405 B.R. 34, 42 (Bankr. D. Mass. 2009) (holding that the decision to commence a Chapter 7 case on the corporation's behalf rested with the corporation's board of directors under its by-laws and Delaware law); In re ComScape Telecomms., Inc., 423 B.R. 816 (Bankr. S.D. Ohio 2010) (dismissing bankruptcy filings, including under Delaware law, for lack of authorization where one of two directors filed for bankruptcy unilaterally).

93.    As explained above, Tyagi usurped control of the Debtors through a series of unlawful acts, including the fraudulent inducement of the Stock Exchange Agreement, refusal to recognize BAPL's designee on the board of directors of Cloudeeva Florida, and the unauthorized unilateral execution of corporate documents that purported to install Tyagi as the sole director of both Cloudeeva Florida and Cloudeeva Delaware.  As Tyagi is not lawfully the sole director of either Cloudeeva Florida or Cloudeeva Delaware, his commencement of these Cases was invalid. See Putta Decl., Exh. 34 (December 27, 2013 Order of California Court granting motion to confirm Yella as Director of Cloudeeva Florida).  Moreover, Tyagi's commencement of these Cases constitutes a violation of the July 2013 "Principles of Understanding," in which Tyagi

agreed not to take any corporate action or sign any documents on behalf of Cloudeeva Delaware.

Therefore, the Cases should be dismissed as having been commenced without the requisite

corporate authority.[5]

## CONCLUSION

WHEREFORE, BAPL respectfully requests that this Court (i) appoint a Chapter 11

trustee, (ii) in the alternative, dismiss these Cases, and (iii) grant such other and further relief as

is just and appropriate under the circumstances.


Dated:  August 4, 2014                          Respectfully submitted,

                                                **FOX ROTHSCHILD LLP**

                                                By:  /s/ Ricard M Meth
                                                    RICHARD M. METH (RM7791)
                                                    75 Eisenhower Parkway, Suite 200
                                                    Roseland, New Jersey 07068
                                                    Telephone: 973-992-4800
                                                    rmeth@foxrothschild.com

                                                        and

                                                **BROWN RUDNICK LLP**

                                                    Daniel J. Saval (*pro hac vice* to be filed)
                                                    Mason C. Simpson (*pro hac vice* to be filed)
                                                    Shoshana B. Kaiser (*pro hac vice* to be filed)
                                                    7 Times Square
                                                    New York, New York 10036
                                                    Telephone: (212) 209-4800
                                                    Facsimile:  (212) 209-4801

                                                    *Counsel for Bartronics Asia Pte Ltd.*

---

[5] Although there are more than ample grounds to appoint a Chapter 11 trustee or dismiss these Cases, in the event that the Court determines not to grant that relief, BAPL requests that the Court appoint an examiner pursuant to Section 1104(c) of the Bankruptcy Code.

ACTIVE 26523724v1 08/04/2014